**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 18-cv-2658-WJM-SKC

GIROLAMO FRANCESCO MESSERI,

      Plaintiff,

v.

UNIVERSITY OF COLORADO, BOULDER (through its Board, the Regents of the
University of Colorado, a body corporate),
PHILIP P. DISTEFANO, individually and in his official capacity as Chancellor of the
University of Colorado, Boulder,
VALERIE SIMONS, individually,
REGINA TIRELLA, individually,
JESSICA POLINI, individually,
LAUREN HASSELBACHER, individually,
CAROLE CAPSALIS, individually,
JOHN THOMAS GALLOWAY, individually, and
AGNIESZKA LYNCH, individually,

      Defendants.

---

**ORDER GRANTING IN PART UNIVERSITY DEFENDANTS' MOTION TO DISMISS**
**AND GRANTING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS**

---

Plaintiff Girolamo Messeri was expelled from the University of Colorado at

Boulder (the "University") in November 2016 after the University concluded that he had

non-consensual sexual contact with a woman, identified only as Jane Doe.  (ECF No.

12 ¶¶ 119, 132.)  Plaintiff sues the University and Chancellor Philip DiStefano in his

official capacity (together, "University Defendants") as well as eight University

employees, including DiStefano, in their individual capacities (together, "Individual

Defendants") under various theories about how the University Defendants or Individual

Defendants violated Plaintiff's procedural and substantive due process rights.  (*Id.*)

Plaintiff also alleges that the University Defendants violated his rights under Title IX of

the Education Amendments of 1972 ("Title IX").  Plaintiff seeks damages and injunctive

relief, including a Court order that the University remove any record of Plaintiff's

expulsion from his education file or transcript.  (*Id.* at 62–64.)

Currently before the Court are two motions to dismiss.  The University

Defendants move for partial dismissal of Plaintiff's procedural due process claim and for

dismissal of Plaintiff's Title IX, substantive due process, and "stigma plus" claims for

failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 31.)

The Individual Defendants move to dismiss all claims against them in their entirety,

invoking qualified immunity on each of Plaintiff's claims against them.  (ECF No. 30.)

For the reasons explained below, the University Defendants' Partial Motion to Dismiss is

granted in part, and the Individual Defendants' Motion to Dismiss is granted.

## I. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a

claim in a complaint for "failure to state a claim upon which relief can be granted."  The

Rule 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-

pleaded factual allegations and view them in the light most favorable to the plaintiff."

*Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling

on such a motion, the dispositive inquiry is "whether the complaint contains 'enough

facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy

which must be cautiously studied, not only to effectuate the spirit of the liberal rules of

2

pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

## II. BACKGROUND

This case arises out of a report made to the University of Plaintiff's alleged sexual misconduct, and the University's handling of the investigation pursuant to that report.  The Court first reviews the relevant policies and procedures in place at the time, and then the facts pertinent to Plaintiff's case as plead in his Amended Complaint, which are taken as true for purposes of the Motions.  All paragraph references ("¶ __") are to Plaintiff's Amended Complaint ("Complaint").  (ECF No. 12.)

### A.    The University's Applicable Sexual Misconduct Policy and Procedure

Upon his acceptance to the University, Plaintiff received online access to copies of the Office of Institutional Equity and Compliance's ("OIEC") Process and Procedures 2016–2017 ("OIEC Procedures"),[1] which set forth the definitions and procedures for investigating allegations of sexual misconduct during the 2016–2017 academic year. (¶ 65.)  The University has repeatedly updated OIEC guidance and procedures in an attempt to comply with the 2011 guidance letter ("Dear Colleague Letter") issued by the Department of Education, Office of Civil Rights ("OCR").  (¶¶ 32, 66.)

---

[1] The OIEC Procedures are not attached to the Complaint or any briefing, and thus the Court draws its summary exclusively from Plaintiff's Complaint.

The OIEC Procedures "govern all students."  (¶ 71.)[2]  They state that the University is "committed to providing prompt, fair, impartial and equitable investigation and resolution of any complaint that the University knows . . . about."  (¶ 78.)  They further state that "the OIEC conducts fair and unbiased investigations and treats all individuals who seek our assistance with respect and dignity."  (¶ 72.)  Plaintiff contends that the University does not treat those accused of sexual misconduct with the same respect or dignity as those who are on the receiving end of such alleged misconduct.  (*Id.*)  Plaintiff claims that the OIEC Procedures "repeatedly refer to complainants as 'victims'" and provide links to resources geared toward victims.  (¶ 75.)

According to the facts alleged in the Complaint, the OIEC uses the following investigative model.  (¶ 82.)  Upon a report of misconduct from a person ("complainant"),[3] the University assigns one or more investigators to gather evidence and determine whether, under a preponderance of the evidence standard, a student accused of sexual misconduct ("respondent") is responsible for violating the University's sexual misconduct policy.  (¶¶ 23–24, 85.)  A respondent allegedly has no right to a

_____

[2] It is undisputed that Jane Doe was not a student at the University or otherwise associated with the University, and that the alleged assault took place in a campus dormitory.  Under Title IX, it is not entirely clear what the University's obligations are to investigate a sexual assault when the alleged victim is not part of the University community.  At least one court in this District has observed that "Title IX liability is limited to sexual harassment that deprives a CU student of access to educational benefits or opportunities.  Harassment of non-students does not deprive a CU student of access to educational benefits or opportunities."  *Simpson v. Univ. of Colo.*, 372 F. Supp. 2d 1229, 1237 (D. Colo. 2005) (citation omitted), *rev'd on other grounds*, 500 F.3d 1170 (10th Cir. 2007).  Nonetheless, the alleged misconduct occurred on campus, and Plaintiff is subject to the University's disciplinary policies.

[3] A complainant may be the person who allegedly suffered the sexual misconduct, or another person with knowledge of the alleged misconduct.

hearing or any process through which he or she may question the complainant or other witnesses.  (¶¶ 82–83.)  A respondent does not have access to complainant or witness statements until the investigation is completed and a Written Evidence Summary is provided by the investigator.  (¶ 84.)

The investigator prepares a Final Investigation Report ("FIR"), which is reviewed by the Standing Review Committee for "bias and impartiality, thoroughness of the investigation and sufficiency to support the finding."  (¶ 86.)  The Standing Review Committee may not conduct its own investigation or hearing.  A respondent is not provided with any information about the identity of the Standing Review Committee members.  (*Id.*)  Plaintiff contends that the Standing Review Committee members "lack adequate training and merely rubber stamp the investigators' Finding."  (¶¶ 87.)

After a review of the FIR by the Standing Review Committee, a respondent is provided a Notice of Finding and the FIR.  (¶¶ 85–86, 89.)  After the Notice of Finding is issued, the matter is turned over to Defendant Valerie Simons, OIEC Executive Director and Title IX Coordinator, to determine the sanction.  (¶¶ 89, 93.)  Simons may elect to reopen an investigation in limited circumstances.  (¶ 93.)  Simons may consider the following factors in determining a sanction: respondent's acceptance of responsibility; severity of the conduct and escalation during the incident; complainant's capacity or lack thereof; use of force or violence; prior history of policy violations or criminal activity; impact on the complainant; and ongoing safety risk to the complainant or community. (¶ 91.)  Students who are expelled receive a permanent notation of expulsion on their transcripts.  (¶ 92.)  There is no right to appeal the sanction.  (¶ 93.)

The OIEC Procedures also clarify that any investigation by the OIEC is "separate and apart from any law enforcement . . . proceeding. . . .   Investigations or inquiries conducted by the OIEC are not postponed while . . . criminal proceedings are pending unless otherwise determined by the OIEC."  (¶ 73.)

Plaintiff contends that the OIEC Procedures for sexual misconduct vary significantly from procedures set forth in the Student Code of Conduct, which addresses violations of campus policy other than those involving sexual misconduct or harassment.  (¶ 94.)  Specifically, Plaintiff notes that the Student Code of Conduct, unlike the OIEC Procedures, (1) allows student advisors "to make a statement and ask questions to present relevant information to the conduct officer"; (2) allows respondents to submit questions to be asked of complainant and witnesses; (3) permits interviews to be audiotaped; and (4) permits an appeal for respondents who have been "severely sanctioned."  (*Id.*)

**B.      Interaction Between Plaintiff and Jane Doe**

On September 10, 2016, shortly after Plaintiff began his freshman year at the University, Plaintiff and his roommate, referred to in the Complaint as W2, were walking around campus when they met Jane Doe and her friend, referred to in the Complaint as W1.  (¶ 54.)  Jane Doe and W1 were not students at the University.  (*Id.*)  The group decided to go to Plaintiff and W2's dorm room.  (¶ 55.)  In the dorm room, Plaintiff and Jane Doe began kissing, and shortly thereafter went into the bathroom together.  (*Id.*)  Plaintiff alleges that he asked Jane Doe is she would perform oral sex and she agreed.  (¶ 56.)  He then removed his belt, and Jane Doe began performing oral sex.  (*Id.*)  "After a few minutes," Jane Doe stopped and told Plaintiff she did not feel well and went back

6

into the room to be with her friend.  (*Id.*)  Plaintiff alleges that the sexual encounter lasted between 45 seconds and one minute.  (¶ 103.)

After Plaintiff and Jane Doe exited the bathroom, they continued to spend time together, including outside the dorm room and at a party on the fifteenth floor in Plaintiff's dorm.  (¶ 57.)  In total, Jane Doe and W1 spent approximately 1.5 hours in Plaintiff's dorm building.  (¶ 58.)  When Jane Doe and W1 eventually left the dorm building, "they pressed all the buttons on the elevator and spent time laughing and posting photos of themselves on social media as they stopped at each floor."  (*Id.*) According to video surveillance footage, they also encountered and spoke to W2 while riding the elevator.  (*Id.*)

## C.    The University's Investigation of the Report of Sexual Misconduct

On September 12, 2016, Jane Doe reported to the Colorado University Police Department ("CUPD") that Plaintiff had forced her to perform oral sex on him in his University dorm over the weekend.  (¶¶ 59, 103.)  That same day, CUPD notified the University and OIEC of the report.  (¶ 60.)  Also that day, Defendant Regina Tirella, OIEC Director of Remedial and Interim Measures and Deputy Title IX Coordinator, issued a "Residence Hall Exclusion, Temporary Relocation and No Contact Order" to Plaintiff.  (¶ 95.)  While the Residence Hall Exclusion was in place, Plaintiff lived in a nearby hotel.  (¶ 96.)

Simons appointed Defendants Lauren Hasselbacher and Jessica Polini (the "investigators") to investigate whether the alleged conduct violated the University's sexual misconduct policy.  (¶ 99.)

The investigators interviewed W1.  W1 told the investigators that Plaintiff attempted to get Jane Doe to drink more, that Jane Doe was not flirting with Plaintiff, and that Plaintiff kissed Jane Doe without her permission.  (¶ 114.)  W1 had previously told CUPD that Jane Doe and Plaintiff were "making out" in the dorm room before they went to the bathroom, that Jane Doe did not look disheveled when she emerged from the bathroom, and that she did not hear any noise coming from the bathroom.  (¶ 113.)  Plaintiff contends that W1's statements to investigators were inconsistent with her statements to CUPD, and that OIEC investigators did not question her credibility.  (¶ 114.)  Plaintiff also alleges that the University withheld W1's name from Plaintiff during the investigation.  (¶ 113 n.9.)

The investigators also interviewed W2.  W2 told CUPD that he saw Plaintiff and Jane Doe "making out in a mutual way" and that Jane Doe was flirting with Plaintiff.  (¶ 115.)  W2 also reportedly stated (whether to CUPD or the investigators, it is unclear) that he never heard Plaintiff encouraging Jane Doe to drink, that Jane Doe and Plaintiff did not seem upset when they emerged from the bathroom, and that the foursome continued to socialize in the dorm room after Plaintiff and Jane Doe returned from the bathroom.  (*Id.*)  W2 also reported (again, it is unclear whether to CUPD or the investigators) that Jane Doe became upset with Plaintiff when they took an elevator to a party on a different floor in the dorm and Plaintiff got off the elevator on a different floor with another female.  (¶ 116.)  Plaintiff states that W2 "confirmed that Jane Doe 'didn't take too kindly' to Plaintiff leaving the elevator with another woman."  (*Id.*)  Plaintiff alleges that W2 made consistent statements to CUPD, the investigators, and Plaintiff's private investigator, but Hasselbacher and Polini nonetheless found W2 to lack

8

credibility.  (*Id.*)  Plaintiff contends that there was "no rational basis for the investigators to discredit W2's account and for them to rely on [W1's] changing story."  (*Id.*)

There is no suggestion in the facts alleged that the investigators interviewed Plaintiff to get his story or determine his credibility.

Hasselbacher and Polini never personally interviewed Jane Doe, nor is there any indication that Jane Doe refused to speak to the investigators.  (¶ 104; ECF No. 29 at 12, ¶ 104.)  Instead, they relied on three CUPD interviews with Jane Doe.  (¶¶ 103, 105.)  Jane Doe admitted to staying with Plaintiff, W1, and W2 after the alleged assault, going outside to smoke marijuana with them, and returning to the dormitory building to attend a party on the fifteenth floor.  (¶ 106.)  Jane Doe allegedly told W1 that Plaintiff assaulted her when they were outside smoking.  (*Id.*)

Plaintiff alleges that Jane Doe's recollection of the evening was not consistent across the three CUPD interviews.  (¶¶ 105, 109.)  For example, Plaintiff contends that Jane Doe first told CUPD that she was "kind of drunk," later that she had "three quarters of a bottle of wine and smoked marijuana," and finally that she was a "'four or five' on a scale of one to ten in terms of intoxication."  (¶ 105.)  It is not clear to the Court that these are entirely inconsistent statements.  When CUPD questioned Jane Doe about the elevator ride when she finally left the dormitory, she first stated that she and W1 "were high and did not know where they were going" but later stated that "she and W1 were taking a 'moment of reflection' in the elevator and 'processing' what happened" and that "they were looking for the lobby."  (¶ 109.)  There is no suggestion in the Complaint that Jane Doe's recollection of the sexual encounter with Plaintiff varied across her three interviews.  Plaintiff contends that Hasselbacher and Polini "simply

assumed that Jane Doe was telling the truth," regardless of the inconsistencies in her recounting of events, and thus improperly shifted the burden to Plaintiff to prove his innocence and misapplied the preponderance of the evidence standard for OIEC investigations.  (¶¶ 101–02.)

Based on the CUPD interviews alone, Hasselbacher and Polini determined that Jane Doe provided "materially consistent information to the CUPD."  (¶ 110.)  Plaintiff alleges that the investigators failed to review Jane Doe or W1's social media posts from the night in question.  (¶ 111.)  It is unclear from the Complaint whether the investigators reviewed video surveillance footage of the dormitory from that night.

At some point during the investigation, Polini directed an individual at the Office of Victim Assistance to inform Jane Doe that she was not required to speak to Plaintiff's private investigator and that Plaintiff could be in violation of the no contact order if the investigator harassed Jane Doe.  (¶ 112.)

On November 8, 2016, Hasselbacher and Polini issued the Notice of Finding (the "Finding") that notified Plaintiff that he was found responsible, under a preponderance of the evidence standard, for "Sexual Assault-Non-Consensual Sexual Intercourse." (¶ 119.)

The Finding stated that the "findings have been reviewed and approved by a review committee."  (¶ 120.)  Indeed, the Standing Review Committee, comprising Defendants Carole Capsalis, John Galloway, and Agnieszka Lynch, had received the FIR from the investigators on November 8, and approved it the same day.  (¶¶ 121–22.) At some point prior to issuing the FIR, University Associate Counsel Michelle Krech reviewed the report.  (¶ 123.)

During the course of the investigation, Plaintiff did not have a hearing and alleges that he had no right to submit written questions to the investigators.  (¶ 117.)  Plaintiff had no right to appeal the Finding.  (¶ 124.)

After the Finding, Simons was solely responsible for determining the sanction against Plaintiff.  (¶ 126.)  The OIEC Procedures allowed Plaintiff an opportunity to present mitigating evidence prior to Simons issuing any sanction.  (¶ 125.)  Thus, on November 15, 2016, Plaintiff, his father, his attorney, and the Italian Consul in Denver met with Simons "to present mitigating factors with respect to any sanction that Simons would impose."  (¶ 129.)  Plaintiff alleges that Simons pressured Plaintiff to admit the allegations against him despite her knowledge of the ongoing criminal investigation. (¶ 130.)  Plaintiff disputed Jane Doe's claim and the outcome of the investigation, and denied wrongdoing.  (*Id.*)  Thus, he "made no such admission in order to get a lesser sanction from Simons."  (*Id.*)

On November 23, 2016, the day before Thanksgiving, Simons issued a Notice of Sanction that informed Plaintiff that, based on her review of the investigators' report and all available information, Plaintiff should be "immediately expelled, excluded from all University of Colorado campuses, and that his housing contract was terminated." (¶ 132.)  Plaintiff alleges that Simons had previously represented to Plaintiff that he would be permitted to finish the semester.  (*Id.*)  Plaintiff also claims that Simons "issued the sanction when she knew that Plaintiff was away from campus for the upcoming holiday and had left his belongings in his dorm room."  (*Id.*)

The Notice of Sanction did not notify Plaintiff that Simons could reopen the case if there was new evidence, if OIEC procedures were not followed, or additional

circumstances warranted reopening.  (¶ 133.)  Plaintiff made no further submissions in support of his case.  (*Id.*)

Plaintiff alleges on information and belief that the University administrators, including Simons, were motivated to build a case against Plaintiff and push CUPD and the Boulder County District Attorney's Office to prosecute because Jane Doe's father threatened to sue the University.  (¶¶ 61, 184.)  He also claims that the University "acted in concert with CUPD to build a case against Plaintiff."  (¶ 61.)

Eventually, after the University had expelled Plaintiff, prosecutors filed sexual assault charges against Plaintiff and a warrant issued for his arrest.  (¶¶ 9, 63.)  By that point, Plaintiff had returned home to Italy.  (¶ 63.)  In November 2017, Plaintiff was arrested during a routine traffic stop in Utah.  (¶ 64.)  He pled not guilty, and spent 33 days in jail.  (*Id.*)  The Boulder County District Attorney's Office later dismissed the charges against him.  (*Id.*)

Plaintiff contends that his expulsion, and resulting permanent notation on his transcript, was severe and unwarranted, and the direct and proximate cause of damages to Plaintiff.  (¶¶ 135–36.)  He also pleads on information and belief that the University "has not treated females accused of sexual assault in this way, nor has the University issued such harsh sanctions against female accused."  (¶ 62.)

### III. ANALYSIS

**A.    University Defendants' Partial Motion to Dismiss (ECF No. 31)**

1.    <u>Procedural Due Process (Claim 1)</u>

The Fourteenth Amendment's Due Process Clause states, "No state shall . . . deprive any person of life, liberty, or property without due process of law."  U.S. Const.

amend. XIV, § 1.  A court must "examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citation omitted); *see also Zwygart v. Bd. of Cnty. Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007).

"[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976) (alterations in original).  To discern the procedural protections demanded by any particular situation, the Court must consider the following three factors:

•   The interests of the individual in retaining their property and the injury threatened by the official action;

•   The risk of error through the procedures used and probable value, if any, of additional or substitute procedural safeguards; and

•   The costs and administrative burden of the additional process, and the interests of the government in efficient adjudication.

*Id.* at 335.  Because the Court is considering a Rule 12(b)(6) motion, the Court need only evaluate whether Plaintiff has a plausible claim that these three factors will weigh in his favor.  *See, e.g.*, *Doe v. Alger*, 175 F. Supp. 3d 646, 656 (W.D. Va. 2016) ("*Alger*") (evaluating "whether the plaintiff has sufficiently alleged that the process he received was constitutionally inadequate").

The University Defendants do not challenge Plaintiff's property or liberty interest at the foundation of his due process claim, but instead move to dismiss three of sixteen

arguments regarding the allegedly inadequate process Plaintiff received. (*See* ¶ 165(i)–(xvi).) The Court will address each of the three in turn.

> a.   *Residence Hall Exclusion*

Plaintiff concedes that exclusion from the residence hall does not support a procedural due process violation. (ECF No. 39 at 19 n.40.) Accordingly, the Court dismisses this portion of Plaintiff's procedural due process claim with prejudice.

> b.   *University Counsel's Review of the FIR*

Plaintiff contends that the OIEC Procedures did not put Plaintiff on notice that the University's counsel would review any FIR. (¶ 123.) In addition, Plaintiff suggests that review of the FIR by Krech prior to issuance of the Finding "plausibly affected the fairness and impartiality of the Title IX investigation, and Finding, by injecting legal analysis into the process that was intended to protect the University's legal interests over Plaintiff's." (ECF No. 39 at 20.)

"[A] university's failure to follow its established guidelines in overseeing a grievance does not in and of itself implicate constitutional due process concerns." *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 522 (10th Cir. 1998). Thus, the University Defendants' alleged failure to give notice in the OIEC procedures that the University's counsel could review the FIR does not alone support a due process violation.

Further, Plaintiff does not plead facts to support a claim that Krech's review impacted Plaintiff's notice or opportunity to be heard in the disciplinary proceeding. In his Response, Plaintiff suggests that Krech impacted the fairness and impartiality of the investigation by injecting legal analysis to protect the University's interests, and that

14

Hasselbacher and Polini relied on Krech's advice rather than their own judgment. (ECF No. 39 at 20.)  However, the Complaint seems to suggest that Krech should have done *more*, that is, she should have rejected the investigators' finding of responsibility, and thus substituted her judgment for that of the investigators.  (¶¶ 123, 165(vi).)  Under the facts plead in the Complaint, there are no plausible allegations that Krech's review impacted the outcome, much less adversely impacted Plaintiff's notice and opportunity to be heard.  The Court thus dismisses this portion of Plaintiff's procedural due process claim without prejudice.

### c.     *Assistance with CUPD's Investigation*

Plaintiff suggests that the University, through Simons, attempted to coerce Plaintiff to admit misconduct to assist CUPD in its criminal investigation, and acted in concert with CUPD to build a case against Plaintiff.  (¶ 165(xii) & (xvi).)  Specifically, Plaintiff alleges that Simons encouraged pursuit of criminal charges against Plaintiff to justify or bolster the University's decision to expel Plaintiff and appease Jane Doe's father, who threatened legal action against the University.  (¶¶ 8, 61.)  However, Plaintiff cites no facts to support such a claim, such as contacts between Simons and the CUPD or the Boulder County District Attorney's Office.  Nor does Plaintiff address how the University Defendants' supposed assistance with the CUPD investigation interfered with his liberty or property interests, or how additional procedural safeguards would have protected against injury to his interests.  Under the facts alleged, Plaintiff fails to state a plausible claim that Simons or the University violated Plaintiff's rights to procedural due process by encouraging CUPD to investigate or the Boulder County District Attorney's Office to file criminal charges.

Plaintiff also contends that Simons pressured Plaintiff into confessing to assist CUPD's investigation.  However, when determining a sanction, Simons may consider the respondent's acceptance of responsibility.  Thus, seeking a statement from Plaintiff relative to his culpability during the administrative process was consistent with the OIEC Procedures.  (¶ 91.)  Moreover, the OIEC Procedures explicitly informed Plaintiff that the OIEC investigation was "separate and apart from any law enforcement . . . proceeding" and would not be postponed pending any criminal investigation.  (¶ 73.)  In addition, authority located by the Court strongly suggests that there would have been no constitutional violation for pursing an internal investigation while criminal charges were pending for the same conduct:

> Not only is it permissible to conduct a civil [administrative] proceeding at the same time as a related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil [administrative] proceeding.

*MacKay v. DEA*, 664 F.3d 808, 820 (10th Cir. 2011) (quoting *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995)); *see also Doe v. DiStefano*, 2019 WL 2372685 (D. Colo. June 5, 2019).

Presumably, consistent with *MacKay*, Simons considered Plaintiff's failure to present mitigating evidence or to accept responsibility in issuing the sanction.  Thus, the University's investigation process—including seeking statements from Plaintiff about mitigating factors with respect to a potential sanction during the pendency of a criminal investigation—does not implicate Plaintiff's procedural due process rights.  Accordingly,

the Court dismisses with prejudice Plaintiff's procedural due process claim arising out of the University Defendants' alleged assistance with CUPD's investigation.

    2.   <u>Stigma Plus Due Process (Claim 4)</u>

Plaintiff alleges that the University Defendants harmed his reputation without due process by adding a "defamatory notation on Plaintiff's transcript, which was issued without due process" (¶ 239) and "disseminat[ing] [ ] student transcripts through the National Student Clearinghouse" (¶ 237).

Harm to reputation alone is not the sort of harm that supports a procedural due process claim. *Brown v. Montoya*, 662 F.3d 1152, 1167 (10th Cir. 2011). Rather, there must be some attendant diminishing of another legal right, such as a right to public employment or public education—the so-called "stigma plus" test. *See Paul v. Davis*, 424 U.S. 693, 708–11 (1976); *Brown*, 662 F.3d at 1167; *Alger*, 175 F. Supp. 3d at 656–61.

Here, Plaintiff alleges a liberty interest in his reputation coupled with a property interest in his continued enrollment in the University, a public, higher education institution. (ECF No. 38 at 23–25.) The University Defendants implicitly concede that Plaintiff's enrollment at the University entitled him to some due process protections prior to expulsion for non-academic reasons. However, the University Defendants argue that such an interest is an insufficient property interest in the context of a stigma plus due process claim. (ECF No. 31 at 15.)

Plaintiff's argument is premised on *Harris*, a Tenth Circuit decision that found that the plaintiff had a property interest in continued enrollment in his graduate program. (ECF No. 39 at 23–25.) In *Harris*, the Tenth Circuit held that the plaintiff had a property

interest because "Colorado has created the basis for a . . . claim of entitlement to an education in its state college system, which includes the University of Northern Colorado" and the legislature had directed that the college "'be open . . . to all persons resident in this state' upon payment of a reasonable tuition fee." *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir.1986) (citing Colo. Rev. Stat. § 23-50-109 (1973)).  The Court notes that the statute on which *Harris* based its ruling was repealed effective July 1, 2003.

The University Defendants attempt to cabin *Harris*, contending that, unlike the University of Northern Colorado, there is no open enrollment statute for the University that gives Plaintiff a property interest in attending the University.[4]  (ECF No. 47 at 10.) The University Defendants ignore the development of the Tenth Circuit's jurisprudence since *Harris* and the Tenth Circuit's clear pronouncements that a student enrolled at a public university has a property interest in continued enrollment.  Although the statutory basis for *Harris* has eroded, the Tenth Circuit has gone beyond the statutory basis identified in *Harris* and has found a property interest in continued enrollment in a graduate program without finding any specific statutory basis for that right.  *Gossett v. Okla. ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1181 (10th Cir. 2001) ("As an initial matter, we note that Mr. Gossett had a property interest in his place in the Nursing School program" at Langston University "that is entitled to due process

---

[4] Judge John L. Kane of this District impliedly rejected a similar argument by Colorado State University ("CSU") that attempted to distinguish between the open enrollment statute for the University of Northern Colorado (at issue *Harris*) and a competitive enrollment admission statute for CSU.  *See Siblerud v. Colo. State Bd. of Agric.*, 896 F. Supp. 1506, 1512–13 & n.12 (D. Colo. 1995).

protection under the Constitution." (citing *Harris*, 798 F.2d at 422)); *Yeasin v. Durham*, 719 F. App'x 844, 852 (10th Cir. 2018) ("We have held that university students have a property interest in their continued education." (citing *Harris*, 798, F.2d at 424)); *see also Lemon v. Labette Cmty. Coll.*, 6 F. Supp. 3d 1246, 1251 (D. Kan. 2014).

The U.S. District Court for the District of Kansas explained:

> In *Goss v. Lopez*, 419 U.S. 565, 574 (1975), the Supreme Court held that, once provided, public education becomes "a property interest which may be protected by the Due Process Clause." The Tenth Circuit extended and expanded this right in *Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975) (holding that an individual's place in a post-secondary nursing program constitutes a protected property interest), where the court found that "in light of *Goss* . . . where the Supreme Court recognized a property right in public school students, that certainly such a right must be recognized to have vested [where a student] paid a specific, separate fee for enrollment and attendance at [a technical] school." Tenth Circuit decisions since then have continued this trajectory and expanded it to a more generalized property interest in continuing graduate education, with a concomitant procedural due process right. *Harris*, 798 F.2d at 422 (graduate student had a property interest in his graduate education which entitled him to due process); *Gossett*, 245 F.3d 1172 (nursing student had a property right in his nursing education and was entitled to due process under the U.S. Constitution); *Byrnes v. Johnson Cnty. Cmty. Coll.*, 2011 WL 166715, at * 1–2 (D.Kan. Jan. 19, 2011) ("Defendants argue that Plaintiff has no constitutionally protected property interest in her post-secondary education, but the law is clearly otherwise.").

*Lee v. Kan. State Univ.*, 2013 WL 2476702, at *6 (D. Kan. June 7, 2013) (alterations in original; footnoted citations included in text). It continued, "[i]n light of these decisions, the [c]ourt concludes that the Tenth Circuit recognizes a constitutional right to due process before a student can be deprived of her property interest in her continued enrollment and graduate education." *Id.*

19

It is noteworthy that the Tenth Circuit's decisions in *Gaspar* (1975) and *Gossett* (2001), both of which find a property interest in continued enrollment in a public university, make "no mention . . . of the state law basis for that property interest." *Aragon v. Gautreaux*, 2006 WL 8444079, at *3 (D.N.M. July 19, 2006).  This strongly suggests that, in the Tenth Circuit, there exists an interest in continued enrollment in a public university regardless of any state statutory basis *vel non*.  The Court notes that while many of the cases discuss this right in the context of graduate students, it perceives no legal basis for why the same property interest in continued enrollment should not also extend to an undergraduate student.

In sum, the Court finds that Plaintiff, as an enrolled undergraduate student, had a property interest in continued enrollment at the University, which, when coupled with his liberty interest forms an adequate basis for his stigma plus due process claim. Accordingly, the Court denies the University Defendants' Motion as to that claim.

3.    Substantive Due Process (Claim 2)

Plaintiff claims that the University Defendants violated his substantive due process rights in the following ways: (1) the investigators lacked a rational basis for the Finding and the Standing Review Committee acted arbitrarily in evaluating the evidence against Plaintiff; (2) Simons's decision to expel Plaintiff based on the investigators' Finding was arbitrary and Simons had a conflict of interest; (3) the timing of the sanction was shocking; and (4) the University's actions related to the criminal investigation were shocking.  (ECF No. 39 at 21–23.)  The University Defendants contend that the University and its employees had a rational basis for the decisions reached during the investigation and subsequent sanction, that referral for criminal investigation is not

conscience-shocking, and that ultimately "Plaintiff complains about a University disciplinary process with which he disagrees, and which reached a result he does not like." (ECF No. 31 at 4–6.)

"[T]he touchstone of due process is protection of the individual against arbitrary action of government." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 8446 (1998) ("*Lewis*"). When fundamental rights are not at issue, substantive due process "bars certain arbitrary, wrongful government actions 'regardless of the fairness of the procedures used to implement them,'" *Zinermon v. Burch*, 494 U.S. 113, 125 (1990), but only for "the most egregious official conduct [that] can be said to be arbitrary in the constitutional sense." *Williams v. Berney*, 519 F.3d 1216, 1220 (10th Cir. 2008) (citing *Lewis*, 523 U.S. at 840); *see also Reid v. Pautler*, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014) ("The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons."). In the briefing on this point both sets of counsel frequently failed to accurately distinguish between the two types of due process claims, making the Court's consideration of these issues far and away more difficult than it needed to be.

In any event, because Plaintiff's interest in continuing his education at the University does not implicate a fundamental right, to state a claim for a substantive due process violation, Plaintiff must sufficiently allege the University's actions were arbitrary, lacked a rational basis, or would shock the conscience of federal judges. *Butler v. Rio Rancho Pub. Sch. Bd. of Educ.*, 341 F.3d 1197, 1200–01 (10th Cir. 2003); *Tonkovich*,

159 F.3d at 528; *Lewis*, 523 U.S. at 845–46; *Brenna v. S. Colo. State Coll.*, 589 F.2d 475, 477 (10th Cir. 1978) ("'Substantive' due process requires only that termination of [an] interest not be arbitrary, capricious, or without a rational basis."). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing governmental power." *Tonkovich*, 159 F.3d at 528. "Instead a plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id.* (internal quotation marks omitted). "Not surprisingly, little governmental action is held unconstitutional under this formulation." *Williams*, 519 F.3d at 1221 (quoting 1 Martin A. Schwartz, *Section 1983 Litigation* § 3.05[D], at 3–116 (4th ed. 2006)) (alterations incorporated).

### a.   *Investigation and Standing Review Committee*

After reviewing in detail Plaintiff's substantive due process claims based on the investigation and Standing Review Committee review, the Court finds that Plaintiff fails "to identify any actions that support th[ese] claim[s] beyond the alleged procedural deficiencies." *See Doe v. U.S. Merch. Marine Acad.*, 307 F. Supp. 3d 121, 156 (E.D.N.Y. 2018). Plaintiff attacks the investigators' Finding as "arbitrary" and without "a rational basis," but the actions he alleges in support of this claim question *the process* he received, namely that the investigators were not neutral arbitrators (as evidenced by their supposed gender-biased decision making and desire to bolster the University's reputation), ignored exculpatory evidence, and failed to question Jane Doe's credibility. (*See, e.g.*, ¶ 168 (alleging procedural due process claims based on Plaintiff's "right to a fair adjudication free of bias" and "his right to be heard by an impartial factfinder").)

Similarly, Plaintiff claims that the Standing Review Committee's review of the FIR was arbitrary because the Committee spent less than one day evaluating the evidence, implying that had the Standing Review Committee more thoroughly reviewed it (in other words, used a better process), it would have come to a different result.  (*See, e.g.*, ¶ 165(xiv) (alleging a procedural due process claim based on the "sham review process for review of the [FIR] through the Standing Review Committee").)

Ultimately, the investigators and the Standing Review Committee did not make the decision to terminate Plaintiff's interest in continued enrollment in the University, but instead were actors in the process that facilitated that decision.  These claims are quintessential procedural due process claims, not substantive due process claims.

The University Defendants moved only to dismiss a limited subset of Plaintiff's procedural due process claims against them.  Because the University Defendants did not move to dismiss Plaintiff's procedural due process claims premised on the investigators' process or the actions of the Standing Review Committee, the Court will not address whether these alleged violations state a procedural due process claim. Although the Court may consider these arguments in the future in the context of Plaintiff's procedural due process claim, the Court today dismisses these claims with prejudice to the extent they fail to state a substantive due process claim.

> b.    *Sanction*

The Tenth Circuit has stated that it will uphold "a school's decision to suspend a student in the face of a substantive due process challenge if the decision is not arbitrary, lacking a rational basis or shocking to the conscience of federal judges." *Butler*, 341 F.3d at 1200.  Simons's decision to expel Plaintiff based on the Finding did

23

not violate Plaintiff's substantive due process rights.  First, to the extent that Plaintiff challenges Simons as a biased decisionmaker (*see* ¶ 168), Plaintiff challenges only the way in which he was expelled, not the fact of his expulsion.  Thus, he states only a procedural due process claim, not a substantive due process one, and the Court refers the parties' to the discussion and conclusion in the preceding section.

As for the sanction of expulsion, "[e]ven taking [Plaintiff's] version of the facts as true, as we must we cannot say that the charges and the penalty he faced were unconstitutionally arbitrary."  *See Tonkovich*, 159 F.3d at 531.  Expulsion is one remedy explicitly contemplated by the OIEC Procedures when there is a Finding that a respondent violated the University's sexual misconduct policy (¶ 92), and the University has expelled or otherwise disciplined students for similar violations of campus policy, *see, e.g.*, *Doe v. DiStefano*, 2019 WL 2372685, at *1 (D. Colo. June 5, 2019); *Doe v. DiStefano*, 2019 WL 1254943, at *1 (D. Colo. Mar. 19, 2019); *Norris v. Univ. of Colo., Boulder*, 362 F. Supp. 3d 1001, 1007 (D. Colo. 2019).[5]  Simons exercised her discretion in selecting a sanction, and decided on a sanction supported by the OIEC Procedures and precedent at the University.

---

[5] The University is not the only higher education institution in Colorado that has expelled or otherwise disciplined students after finding they have violated university sexual misconduct policies.  *See Doe v. Univ. of Denver*, 2018 WL 1304530, at *2 (D. Colo. Mar. 13, 2018); *Doe v. Univ. of Denver*, 2019 WL 3943858, at *2 (D. Colo. Aug. 20, 2019); *Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045, at *4 (D. Colo. Feb. 16, 2017); *Johnson v. W. State Colo. Univ.*, 71 F. Supp. 3d 1217, 1223 (D. Colo. 2014).  Universities across Colorado—and indeed, across the country—are grappling with their obligations under Title IX, how to investigate allegations of sexual misconduct, and appropriate sanctions for those found to have violated sexual misconduct policies.  *See* Diane Heckman, *The Proliferation of Title IX Collegiate Mishandling Cases Involving Sexual Misconduct Between 2016-2018: The March to the Federal Circuit Courts*, 358 Ed. Law Rep. 697 (2018) (citing cases).

Expulsion pursuant to a finding of sexual misconduct, while a harsh remedy, does not rise to the level of shocking the conscience because the University has an interest in providing a safe environment for students and assuring compliance with campus policies.  *See Doe v. Miami Univ.*, 882 F.3d 579, 599 (6th Cir. 2018) ("imposition of sanctions on [student] is rationally related to Miami University's legitimate interest in investigating alleged violations of its student code of conduct and disciplining those found responsible").  The Court thus grants the University Defendants' Motion and dismisses with prejudice Plaintiff's substantive due process claim based on the sanction of expulsion.

c.    *Timing of Sanction*

Plaintiff has not sufficiently alleged that the timing of the sanction was arbitrary or without a rational basis; rather he alleges that after Simons concluded that the sanction was appropriate, she proceeded to issue the sanction.  Plaintiff contends that Simons decided to expel Plaintiff on November 16, 2016, but waited until November 23 to issue the sanction, "when she knew that Plaintiff was away from campus."  (¶ 132 & n.11.)

Theoretically, the manner and timing of the delivery of the sanction could violate substantive due process if the manner was so arbitrary that it lacked any rational basis. For instance, had the University delivered the sanction by hiring a skywriter or a singing telegram, the Court could easily conclude that the University had no rational basis in delivering the information in such a public and potentially embarrassing way.  Arguably, deciding on a sanction but waiting months or years to deliver a sanction, or waiting to issue a sanction on the eve of Plaintiff's graduation, could state an arguable substantive due process claim because Plaintiff could have reasonably assumed that such a

25

sanction was not forthcoming or that the timing was designed only to harass Plaintiff, and not for any reasonable objective of the University.

However, Plaintiff's allegation of a several-day delay is insufficient to state a substantive due process claim because, even considering the upcoming school holiday, the timing and delay does not shock the conscience.  While Plaintiff contends that he was "forced to make last minute arrangements over a holiday weekend," he would have been forced to make last minute arrangements whenever Simons issued the sanction. And the Court can easily conceive of a rational basis for the timing: there would presumably be fewer people around campus and a long weekend would provide Plaintiff additional time to make arrangements.  Thus, on the facts alleged regarding timing of the sanction, Plaintiff fails to state a substantive due process claim, and the Court dismisses that portion of the claim with prejudice.

d.      *Coordination with CUPD and the Boulder County District Attorney*

Finally, Plaintiff alleges that the University's work with the CUPD and the Boulder County District Attorney's Office violates his substantive due process rights. Specifically, Plaintiff argues that the University's "reliance on close relationships with CUPD and the Boulder [County] District Attorney's office to push for prosecution of male students in order to bolster the University's reputation" is conscience-shocking.  (ECF No. 39 at 22.)  It is not.  The CUPD and Boulder County District Attorney's Office are independent bodies responsible for investigating and prosecuting potential criminal activity.  Jane Doe initially reported the alleged assault to CUPD, who in turn reported it to OIEC.  Thereafter, CUPD investigated the report on its own, interviewing Jane Doe three times.  Merely reporting and working with those institutions to exchange

26

information does not rise to the level of egregious behavior that shocks the conscience. In addition, providing accurate information to Jane Doe about her obligations to speak with Plaintiff's private investigator (given that she had no such obligations), and pursuing administrative action against Plaintiff while criminal charges were pending, does not interfere with Plaintiff's rights to develop a criminal defense and is not conscience-shocking.

The Court thus dismisses Plaintiff's substantive due process claim premised on investigative coordination with the CUPD and the Boulder County District Attorney's Office. Though Plaintiff asserts this claim under the guise of substantive due process, the Court observes that there may instead be a malicious prosecution claim lurking under the surface. *See Sanchez v. Hartley*, 810 F.3d 750, 758 (10th Cir. 2016) (noting a distinction between a substantive due process claim and a malicious prosecution claim); *Becker v. Kroll*, 494 F.3d 904, 923 (10th Cir. 2007). Because the Court can conceive of a way in which Plaintiff could bring such a claim, this portion of Plaintiff's substantive due process claim is dismissed without prejudice.

4.    Title IX (Claim 3)

Plaintiff claims that the University's Title IX process was biased against him *because he is male*, and therefore the University discriminated against him on the basis of sex in violation of Title IX.

Title IX declares that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Title IX is enforceable through an implied private right

27

of action for monetary damages as well as injunctive relief. *See Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60 (1992); *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979).

"Title IX was enacted to supplement the Civil Rights Act of 1964's bans on racial discrimination in the workplace and in universities." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 714 (2d Cir. 1994). In *Yusuf*, the Second Circuit first recognized a private cause of action under Title IX based on a theory that a campus disciplinary proceeding was improperly motivated or affected by the respondent's sex. *Id.* Courts within this District have looked to *Yusuf* and recognized such private causes of action. *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1077 (D. Colo. 2017); *Doe v. Univ. of Denver*, 2019 WL 3943858, at *4. *Yusuf* expounded two theories—really, evidentiary templates—under which a cause of action would lie: (1) erroneous outcome, where a plaintiff alleges "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"; and (2) selective enforcement, where a plaintiff "asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." 35 F.3d at 715. "While some of the elements of the claims are different under these theories, both require that a Plaintiff show that gender bias was a source of the deprivation." *Johnson*, 71 F. Supp. 3d at 1224. The Court finds that the gender bias element of the claim is dispositive here, and so it need not address the distinctions between the erroneous outcome and selective enforcement theories.

"A plaintiff alleging racial or gender discrimination by a university must do more than recite conclusory assertions. In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as

well as circumstances giving rise to a plausible inference of . . . discriminatory intent."
*Yusuf*, 35 F.3d at 713.  "The Court basically agrees . . . that Plaintiff needs no more than
a minimally plausible inference" to state a claim under the *Twombly*/*Iqbal* pleading
standard.  *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1077.  However, the Court
is not required to "accept allegations of gender bias purely 'on information and belief,'
with no explanation for the information leading to that belief."  *Id.*

Plaintiff raises the following evidence to demonstrate a plausible inference of bias
against males:

- a campus climate—in which the University's disciplinary choices for male
  respondents accused of sexual harassment was being scrutinized by the
  OCR, the student newspaper, and others—led to gender bias in the
  investigation and sanction of Plaintiff;

- on information and belief, Plaintiff alleges that a greater number of male
  students are found responsible for OIEC Procedure violations, and the
  sanctions given to male students who violate the OIEC Procedures are
  "far more severe and unduly harsh," and that female respondents are not
  reported to law enforcement;

- Simons's conflicting roles as the head of OIEC, including her responsibility
  for the OCR investigation as well as Title IX compliance and reporting, led
  to her sanctioning Plaintiff more harshly and to report Plaintiff to the
  authorities because of his gender;

- Hasselbacher's prior experience as an advocate for victims of domestic violence and sexual assault made her biased against males and impacted Hasselbacher's investigation of the allegations against Plaintiff;

- the OIEC staff's training in a trauma-informed approach to investigations led the staff "*not to* question a complainant's credibility"; and

- the investigators failed to question Jane Doe's credibility.

(ECF No. 39 at 3–8.)

Considering all of Plaintiff's allegations of gender bias against males, the Court does not find that the specifically alleged events are circumstances giving rise to a minimally plausible inference of discriminatory intent. *See Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1077. The Court rejected similar allegations of gender bias in that case. Specifically, "pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible *because they are men.*" *Id.* (emphasis added). Similarly, the Court finds here that scrutiny and criticism from the student newspaper does not say anything about the University's desire to find men responsible because they are men. *Id.  But see Doe v. Columbia Univ.*, 831 F.3d 46, 57–58 (2d Cir. 2016).

As for Plaintiff's claim that a greater number of male students are investigated and found responsible for violations of sexual misconduct, "the Court sees no inference to draw in Plaintiff's favor." *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1077. "The majority of accusers of sexual assault are female and the majority of the accused

are male, and the University is not responsible for the gender makeup of those who are accused . . . of sexual misconduct." *Id.* (internal quotation marks and citations omitted).[6]

As for Plaintiff's other claims pled on information and belief—that female respondents are penalized less harshly and less frequently reported to the police or district attorney's office—Plaintiff has not stated an explanation of what information leads him to that belief, nor does he aver that the factual contentions "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *See id.*; Fed. R. Civ. P. 11(b)(3).  Instead, Plaintiff claims that he "needs to obtain discovery in order to assess this claim," suggesting that in fact he does not have a basis for his belief.  (¶ 207 n.14; ¶ 208 n.15.)   Contrary to Plaintiff's suggestion, his allegation that the University "possesses communications and documents evidencing a predisposition to favor female students alleging sexual misconduct over made students who are accused" is not sufficient to support his allegations that female respondents are not penalized as harshly or referred for criminal investigation.  (*See* ¶ 213.)

The allegations that Simons was biased against males are primarily based on her other responsibilities as head of the OIEC, such as responding to the OCR investigation and reporting statistics to DiStefano about Title IX investigations and outcomes. Simons's responsibilities at OIEC do not give rise to the inference that Plaintiff

---

[6] The Court reiterates its observation in *Doe v. Univ. of Colo., Boulder* that if "enforcement officials are regularly presented with a scenario involving the same two potential classifications—. . . sexual assault suspect *and* male—there must come a point when one may plausibly infer that stereotypes about the protected classification (such as gender or ethnicity) have begun to infect the enforcement process generally."  255 F. Supp. at 1076.

suggests.  Rather, they suggest that Simons is invested in investigating claims of sexual assault and punishing violators regardless of gender.  *See, e.g.*, *Doe v. Univ. of Denver*, 2019 WL 3943858, at *5 (D. Colo. Aug. 20, 2019) ("The purported 'more aggressive handling of sexual misconduct complaints' does not support a finding of gender bias" but rather "only a more serious handling of sexual misconduct allegations in general."). In addition, Plaintiff does not allege that Simons would have issued a less severe sanction if Plaintiff were female, and Jane Doe male.  Finally, Simons's prior work to integrate women into an all-male college also suggests that she is pro-equal opportunity, not anti-male.

Plaintiff also argues that Hasselbacher's prior experience as an advocate for victims of domestic violence and sexual assault makes her biased against males, and that the bias manifested itself in the investigative process and the investigators' credibility determinations.  Notably, unlike in *Norris v. Univ. of Colo., Boulder*, Plaintiff does not allege any discrepancy in Hasselbacher or Polini's treatment of Jane Doe and Plaintiff, such as time to review evidence, participation in the investigation, other than the investigators' credibility determinations.  362 F. Supp. 3d 1001, 1012 (D. Colo. 2019).

Turning to the issue of credibility determinations, this case presents a closer call than *Doe v. Univ. Colo., Boulder*, given the investigators' failure to personally interview Jane Doe or Plaintiff, and the investigators' determinations that Jane Doe was credible solely based on review of CUPD interviews.  *See Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d at 1079.  However, Plaintiff does not allege that Hasselbacher or the other investigator would have judged credibility differently had Plaintiff been female or Jane

Doe male.  *Id.*  Moreover, "the inference of pro-victim bias is an 'obvious alternative explanation,' that overwhelms any potential inference of gender bias."  *Id.* (internal citation omitted).

Finally, the investigators' training in trauma-informed investigations is not inherently pro-female or anti-male.  As Chief Judge Philip A. Brimmer of this District observed in *Doe v. Univ. of Denver*, the plaintiff failed to provide an explanation as to why a trauma-informed investigation with a "victim-centered approach" "demonstrates a bias against male students, given that men, like women, can be victims of sexual assault."  2019 WL 3943858, at *9.  "Facially gender-neutral sexual misconduct policies . . . do not create an inference of gender bias."  *Id.* (quoting *Doe v. Colgate Univ.*, 2017 WL 4990629, at *15 (N.D.N.Y. Oct. 31, 2017)).  Thus, the investigators' training in and use of a trauma-informed approach to the investigation does not support an inference of anti-male bias.

Finally, as the University Defendants note, Plaintiff himself suggests that the University was influenced by the threat of Jane Doe's father to sue the University, suggesting a not altogether valid or supportable reason for the investigation, but certainly an alternate reason for the outcome of the disciplinary proceeding that had nothing to do with Plaintiff's gender.

For these reasons, the Court finds that Plaintiff has failed to raise a plausible inference of gender bias.  Because gender bias is a required element of a Title IX claim, this pleading deficiency is fatal to all of Plaintiff's Title IX claims.  *See Wolfe v. Fayetteville, Ark. Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011) (a showing of gender bias is a necessary element of a Title IX claim).  Accordingly, the University Defendants'

Motion is granted as to Plaintiff's Title IX claim, and the claim is dismissed with prejudice.

**B.      Individual Defendants' Motion to Dismiss (ECF No. 30)**

The Individual Defendants claim that qualified immunity protects them from liability on all claims asserted against them.  (ECF No. 30.)  "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  This Court has discretion to address the "clearly established" element before addressing whether a constitutional violation actually occurred.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time.  *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000).  "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted).

The Individual Defendants argue either that Plaintiff fails to state a claim that any Individual Defendant violated Plaintiff's constitutional rights, or that Plaintiff cannot meet his burden to show that he had a clearly established right to be free from the alleged procedural and substantive due process deprivations he alleges.  The Court agrees. Although Plaintiff expends significant effort attempting to show that courts around the

34

country have found procedural due process and substantive due process violations based on allegations similar to those of Plaintiff, Plaintiff cannot show that the rights he claims were clearly established, or has failed to plead facts showing that the official violated the right.

    1.   <u>Procedural Due Process</u>

Plaintiff argues that he had a "clearly established right to heightened due process protections" and additional procedural safeguards in the University's investigation and disciplinary proceeding.  (ECF No. 38 at 3.)  The Court will address Plaintiff's procedural due process claims, and Defendants' corresponding qualified immunity claims, in turn.

    a.   *General "better process" claims*

Plaintiff first argues that he had a clearly established right to heightened due process protections, and Defendants should have used different procedures to account for the conflicting interests at stake.  (ECF No. 38 at 5.)  Specifically, he argues that he had a clearly established right to a higher burden of proof, appeal, a form of hearing, and cross examination (addressed separately below).[7]  (¶ 165(iv)–(vi), (xv); ECF No. 38 at 4, 6.)  He also argues that DiStefano and Simons were aware of these clearly established rights, but implemented the OIEC Procedures that minimized the due process protections to safeguard those rights.  (ECF No. 38 at 5.)

---

[7] Plaintiff also vaguely suggests that "forcing a student to present mitigating factors—. . . in the face of a criminal investigation—certainly compromised the fairness of the proceeding and violated Plaintiff's right to heightened protections."  (ECF No. 38 at 6.)  Plaintiff cites no authority suggesting a clearly established right not to participate in an administrative proceeding during a criminal investigation for the same conduct.  Indeed, caselaw suggests that an administrative proceeding may go forward despite such a criminal investigation.  *See MacKay*, 664 F.3d at 820.

Plaintiff correctly states that he is entitled to heightened procedural due process protections because he was dismissed from an academic institution for disciplinary, rather than academic, reasons.  (*Id.*)  *See Brown v. Univ. of Kansas*, 599 F. App'x 833, 837 (10th Cir. 2015).  However, he cites no Supreme Court or Tenth Circuit case establishing a right to a standard greater than "preponderance of the evidence," a live hearing (rather than an investigation using an investigator model), or a right to an adequate appeal process.  A vague assertion of rights is insufficient; Plaintiff bears the burden to show that he had a clearly established right, and has failed to do so for these three alleged rights.  (ECF No. 38 at 4–6; ECF No. 47 at 3–5.)  *See Thomas*, 765 F.3d at 1194.  The Individual Defendants are therefore entitled to qualified immunity on Plaintiff's generic "better process" claims.

        b.    *Cross Examination*

Plaintiff alleges that the OIEC Procedures provided no mechanism through which Plaintiff could cross-examine the complainant and that, where credibility assessments are central to an investigation, Plaintiff must be able to cross examine the complainant. (ECF No. 38 at 7.)

Plaintiff admits that the Tenth Circuit has "yet to determine whether cross-examination is required in student disciplinary cases where, as here, university officials are required to assess the credibility in order to determine responsibility."  (*Id.*)  He nonetheless argues that, as of fall 2016, "the weight of authority from other courts clearly establish" such a right, citing a 2005 case from the Sixth Circuit, a 1976 case from the Second Circuit, and five district court orders from the District of Maine (2005), Eastern District of Pennsylvania (2010 and 2013), District of Massachusetts (2016), and

36

Southern District of Ohio (2016).  (*Id.*)  He adds that "more recent decisions of various courts also support the right to cross-examination," referencing a 2018 Sixth Circuit case and a 2018 District of New Mexico case, both cited in the Complaint.  (*Id.*; ¶ 118 n.10.)

Undoubtedly, some form of process that allowed Plaintiff to question Jane Doe's credibility (whether directly at a live hearing or otherwise) would have been helpful to the investigators in this case, given the scant evidence and the "he said, she said" nature of the incident.  However, the cases cited by Plaintiff do not amount to clearly established law or the "weight of authority from other courts" that, in 2016, would have required Simons, DiStefano, Hasselbacher, and Polini to permit cross examination in the OIEC Procedures or in the investigation of the incident.

This finding is supported by *Lee v. Univ. of New Mexico*, cited by Plaintiff, in which the court denied the institutional defendants' motion to dismiss procedural due process claims for the opportunity to cross examine a complainant, but dismissed claims against the individual defendants for the same conduct "given that the contours of [the plaintiff's] due process rights were not clearly established."  17-cv-1230 (D.N.M. Sept. 20, 2018), ECF No. 36 at 3.  However, the Court also notes that in 2017, Magistrate Judge Craig B. Shaffer of this District allowed a due process claim to proceed based on circumstances similar to those in this case because "Plaintiff's allegations plausibly support[ed] that the disciplinary proceeding . . . resolve[d] [ ] a problem of credibility, such that cross-examination of witnesses might have been essential to a fair hearing."  *Neal*, 2017 WL 633045, at *25 (internal quotation marks omitted; alterations incorporated).  It concluded that "[i]n light of the seriousness of

Plaintiff's private interests at stake, and the foregoing legal authorities, the [University's] Board of Governors has not shown it is entitled to dismissal of the due process claim regarding Plaintiff's right to a hearing in which to question witnesses, present witnesses and present other evidence." *Id.* That case, however, did not consider whether the right was clearly established at the time of the incident and investigation in 2015–16.

Even the Sixth Circuit case cited by Plaintiff states that, in the context of a university disciplinary proceeding, "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 636 (6th Cir. 2005). *Flaim* does not support the right to cross examination in every case, but rather those "serious" cases that turn on the credibility of the witnesses. *Id.* at 641; *see Doe v. DiStefano*, 2018 WL 2096347, at *8 (D. Colo. May 7, 2018) ("A student cannot claim, for example, that all academic disciplinary proceedings entail a right of discovery or cross-examination or appeal."). The Sixth Circuit subsequently, in 2017, explicitly stated that in "he said, she said" sexual assault investigations, cross examination is essential to due process. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401–03 (6th Cir. 2017). However, the more recent Sixth Circuit case would not have given the Individual Defendants notice that, in 2016, cross examination was required under the circumstances.

The Court acknowledges that as this area of the law has developed in the last several years, the due process procedures to which a respondent is entitled in a university disciplinary proceeding (particularly one in which the outcome depends on the relative credibility of the witnesses) have become clearer. However, the Court finds that the law on the availability of cross examination was not clearly established at the time of

the investigation in this case in 2016 such that it gave Simons, DiStefano,

Hasselbacher, or Polini notice of Plaintiff's alleged due process rights in this regard.

*See Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015).   Accordingly, Simons,

DiStefano, Hasselbacher, and Polini are entitled to qualified immunity on this portion of

Plaintiff's procedural due process claim.

      c.    *Impartial Investigation*

     "A fundamental principle of procedural due process is a hearing before an

impartial tribunal." *Tonkovich*, 159 F.3d 518.   "A tribunal is not impartial if it is biased

with respect to the factual issues to be decided at the hearing." *Id.*   To disqualify a

hearing officer or tribunal, there must be a "substantial showing of personal bias." *Id.*

Honesty and integrity are presumed, so there must also be "some substantial

countervailing reason to conclude that a decisionmaker is actually biased with respect

to the factual issues being adjudicated." *Id.* (citing *Mangels v. Pena*, 789 F.2d 836, 838

(10th Cir. 1986)).   "Plaintiff need not allege gender bias, or indeed any bias on the basis

of any otherwise legally protected group or class of individuals.   To the contrary, any

type of actual bias is sufficient." *Doe v. DiStefano*, 2018 WL 2096347, at *9.   Plaintiff

has identified, at a broad level of generality, that he had a clearly established right to an

impartial investigation.

     Plaintiff argues that his right to an impartial investigation was compromised by

the bias of (1) the investigators and Simons and (2) the Standing Review Committee.

The Court addresses the allegations against each in turn.

1.    Hasselbacher, Polini, and Simons

Plaintiff suggests that Hasselbacher and Polini employed a "trauma informed approach" to the investigation that ultimately takes a pro-victim bias.  (ECF No. 38 at 10.)  However, Plaintiff does not cite any clearly established law that would have put Hasselbacher and Polini on notice that using a "trauma informed approach" to the investigation would violate Plaintiff's due process rights.  Nor does Plaintiff allege any facts to support his conclusory allegation that a "trauma informed approach" is necessarily "pro-victim."  In other words, Plaintiff has not established that Hasselbacher and Polini had notice that their investigatory approach would violate Plaintiff's due process rights.

Hasselbacher's prior experience as an advocate for women who experienced domestic and sexual violence, and current role as a Title IX compliance officer, do not support a claim of actual bias or a substantial showing of personal bias, much less a "substantial countervailing reason" to overcome a presumption of honesty and integrity. Moreover, Hasselbacher's role in Title IX compliance does not support Plaintiff's allegation of bias; Title IX is designed to protect both men and women by assuring that they will not be denied education on account of sex.  Hasselbacher's role thus requires her to police discrimination (including sexual harassment) against all students, and does not support a claim that she was biased against Plaintiff.

Similarly, Simons's role as the Title IX Coordinator, responsible for reporting statistics on policy violations and as the public voice of the University's efforts to combat sexual violence on campus, does not plausibly support an inference that Simons was actually biased against Plaintiff.  Like Hasselbacher, Simons had an interest in

40

protecting students, regardless of gender, from discrimination and harassment.  Plaintiff has failed to state facts supporting a substantial showing of personal bias, particularly to overcome the presumption of honest and integrity.

Finally, Plaintiff also suggests that Hasselbacher, Polini, and Simons were "potentially biased" by Jane Doe's father threatening litigation against the University, as well as the OCR investigation and the "threat that the University could lose federal funding if it was not compliant with Title IX." (ECF No. 38 at 9.)  These broad claims about the potential financial impact on the University are conclusory allegations, not specific factual statements, that Hasselbacher, Polini, or Simons might be biased against Plaintiff.   Indeed, it is equally plausible that the investigators, aware of the OCR investigation, were incentivized to conduct a more thorough investigation because of the increased scrutiny.

Ultimately, the Court concludes that Plaintiff has failed to make a "substantial showing of personal bias" on the part of Hasselbacher, Polini, and Simons sufficient to plausibly allege the partiality of these Individual Defendants.  As a consequence, the Court finds that they are entitled to qualified immunity as to this claim.

2.    Standing Review Committee

Plaintiff objects to the Standing Review Committee's role because the identities of the committee members were not disclosed, and because they were "potentially biased by Jane Doe's father threatening litigation against [the University], the OCR investigation and the threat that the University could lose federal funding if it was not compliant with Title IX." (ECF No. 38 at 9.)  Plaintiff has cited no case to establish that he has the right to know the identities of all persons involved in the OIEC investigation.

41

In addition, Plaintiff states only general allegations that the Standing Review Committee members were "potentially biased" due to potential financial interests of the University.  He does not allege that the Standing Review Committee members had "personal animosity on the part of [the] members."  *See Tonkovich*, 159 F.3d at 520.  In short, Plaintiff alleges only conclusory allegations of bias, insufficient to sustain a claim against the Standing Review Committee members.  Because Plaintiff fails to plead facts to support a claim that the officials violated a statutory or constitutional right, the Standing Review Committee members, namely Capsalis, Lynch, and Galloway, are entitled to qualified immunity.

        d.    *Exclusion From Residence Hall*

Plaintiff also claims that Individual Defendant Tirella violated his procedural due process rights when she excluded him from the dorms and relocated him to a hotel during the investigation.  However, in response to the Individual Defendants' Motion, Plaintiff withdrew his claims against Tirella.  And in his response to the University Defendants' Motion, he concedes that "the allegations concerning the residence hall exclusion do not support a procedural due process violation."  (ECF No. 39 at 19 n.40.) Accordingly, the Court finds that Plaintiff has failed to state a claim against Tirella and dismisses that portion of Plaintiff's claim with prejudice.

*   *   *

Plaintiff has failed to meet his burden to show it was clearly established that he was entitled to the procedures he claims that he was denied, or to plead facts showing that one or more of the Individual Defendants violated a statutory or constitutional right. *Cf. Austin v. Univ. of Ore.*, 205 F. Supp. 3d 1214, 1221–22 (D. Ore. 2016) (alleged

procedural due process requirements similar to those alleged by Plaintiff here are not clearly established in the Ninth Circuit); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d at 605–06 (same for the Sixth Circuit).  Plaintiff's procedural due process claim will be dismissed against the Individual Defendants because they are entitled to qualified immunity.

   2. <u>Stigma Plus Procedural Due Process</u>

   As discussed above in Part III.A.2, *supra*, Plaintiff has a property interest in his continued enrollment at the University.  Thus, the sole basis on which the Individual Defendants argue that they are entitled to qualified immunity on Plaintiff's stigma plus claim fails.

   Nevertheless, the Court finds that the Individual Defendants are still entitled to qualified immunity.  The alleged deprivations under Plaintiff's stigma plus due process claim mirror his alleged deprivations under his ordinary procedural due process claim.  (*Compare* ¶ 165(i)–(xvi) *with* ¶ 248(i)–(xv).)[8]  And, as discussed above, the Individual Defendants are entitled to qualified immunity for each of those alleged due process violations, *see* Part III.B.1, *supra*.  It would be inconsistent to allow the stigma plus claim, which here is derivative of Plaintiff's procedural due process claim, to go forward, when the Individual Defendants are entitled to qualified immunity on that underlying claim.  The Court therefore grants the Individual Defendants' Motion on the stigma plus procedural due process claim, and dismisses the claim with prejudice.

---

[8] Plaintiff's stigma plus claim does not address his eviction from the dormitory.  In any event, as discussed above, Plaintiff concedes that claim, and the remaining specific allegations of due process violations on Claim 1 and Claim 4 are identical.

3.      Substantive Due Process

Plaintiff's substantive due process allegations against the Individual Defendants are nearly identical to those against the University Defendants.  As discussed in Part III.A.3, *supra*, Plaintiff's allegations fail to allege a substantive due process claim. Plaintiff's substantive due process claims based on Hasselbacher and Polini's alleged bias, the Standing Review Committee's work, or Simons's alleged bias are, in fact, procedural due process claims and the Individual Defendants are entitled to qualified immunity on those claims as discussed in Part III.B.1, *supra*.  Plaintiff's substantive due process claims based on the sanction, timing of the sanction, and coordination with criminal authorities fail to state a claim, and Plaintiff's claim based on the first of these two theories are dismissed with prejudice, and the latter is dismissed without prejudice.

*      *      *

The Court pauses here to make one final observation.  The opportunity for at least some form of cross-examination of the complainant and supporting witnesses is increasingly being recognized as an essential right of procedural due process in these cases.  Indeed, a review of caselaw nationwide as of September 2019 reveals that a growing number of courts are recognizing that a university student facing a disciplinary proceeding for sexual misconduct is entitled to some form of process that allows him or her to test the credibility of the complainant and supporting witnesses, particularly where credibility issues may be determinative of the inquiry.

**IV. CONCLUSION**

For the reasons set forth above, the Court ORDERS as follows:

1. The University Defendants' Partial Motion to Dismiss (ECF No. 31) is GRANTED IN PART AND DENIED IN PART.

2. The University Defendants' Partial Motion to Dismiss is GRANTED as follows:

   a. Plaintiff's procedural due process claims (Claim 1) based on removal from the residence halls and coordination with the local district attorney's officer are DISMISSED WITH PREJUDICE;

   b. Plaintiff's procedural due process claim (Claim 1) based on the University counsel's review of the Finding and FIR is DISMISSED WITHOUT PREJUDICE;

   c. Plaintiff's substantive due process claims (Claim 2) based on the process of the investigators, the Standing Review Committee, or Simons, the sanction, and timing of the sanction are DISMISSED WITH PREJUDICE;

   d. Plaintiff's substantive due process claim (Claim 2) based on coordination with the CUPD or the Boulder County District Attorney's Office is DISMISSED WITHOUT PREJUDICE; and

   e. Plaintiff's Title IX claim (Claim 3) is DISMISSED WITH PREJUDICE;

3. The University Defendants' Partial Motion to Dismiss is DENIED as to the remainder of their Motion; and

4. The Individual Defendants' Motion to Dismiss (ECF No. 30) is GRANTED in its entirety.  Plaintiff's substantive due process claim based on coordination with the CUPD or the Boulder County District Attorneys' Office is DISMISSED WITHOUT

PREJUDICE, and all other claims against the Individual Defendants are

DISMISSED WITH PREJUDICE.


Dated this 23rd day of September, 2019.

BY THE COURT:

William J. Martinez
United States District Judge