EXHIBIT 1

Re: Messeri v. University of Colorado, Case No. 1:18-cv-02658
9 August 2019

Mr. Savela,

Thank you for the opportunity to review the file in *Messeri v. University of Colorado*. The report below draws on the documents produced (to date) by Colorado in discovery; material publicly available through internet searches of the Colorado website, key University policymakers, and contemporaneous media as relevant; and material from my own research on how campuses have responded to allegations of sexual assault since 2011.

Most of my recent research has centered on the trove of material that accompanies lawsuits filed by accused students against their college or university. Between the announcement of 2011 Dear Colleague letter and the submission of this report, there have been 341 federal lawsuits filed by students accused of sexual misconduct (including this lawsuit), and at least 159 filed in state courts. Targeted institutions have been of all types (except for exclusively online universities), from all regions of the country. Some schools—like Colorado—have used an "investigative" model; others have provided a hearing, sometimes with the opportunity for direct or circumscribed cross-examination.

The latter approach provides a more robust opportunity for accused students to defend themselves—to such an extent that the proposed new Title IX regulations indicate that procedures such as those used by Colorado in this case are inconsistent with Title IX.[1]

FERPA ensures that campus disciplinary processes must remain non-public, and so abuses in Title IX proceedings can be much more difficult to detect than in civil or criminal courts. The

[1] OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION, Notice of Proposed Rulemaking, Docket ID ED-2018-OCR-0064 (Nov. 16, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

discovery material associated with lawsuits, however, can bring researchers inside the campus process and provide a way to expose flaws that emerge.

These cases provide the comparator on which I base my comments about Colorado—that is, I am comparing Colorado's record to that of schools where the accused student *already* felt sufficiently aggrieved to file a lawsuit. Even within that sample, Colorado's performance raises questions in at least four areas:

a. gender bias in the campus culture in which the adjudication occurred, with the timing of Messeri's case being of particular relevance given events that had occurred at CU in the late spring and summer of 2016;
b. troubling procedures in the decision to impose an interim punishment on Messeri;
c. a puzzling and inconsistent reliance on the *criminal* investigation to bring a *Title IX* case against Messeri;
d. the unfairness associated with procedures that denied Messeri the right to cross-examination, as part of a general indifference to the due process rights of accused students that dated back several years on campus.

After briefly surveying the political and policy environment that brought us to this point, my report will discuss each of these four areas.

Before commenting on the file, let me offer two points. First, discovery in this case is ongoing. Among other things, the current discovery lists but does not include the specifics of the training that Colorado's investigators and Title IX officials received or depositions of the key university decisionmakers in the case. As a result, this report is a preliminary one. Accordingly, I reserve the right to supplement this report based on new information uncovered during the continuing investigation of this matter.

Second, to review my career regarding this issue: I received a B.A. and Ph.D. in History from Harvard University, and my M.A. came from the University of Chicago; my scholarly background focuses on the history of Congress and procedure. I have been writing on how colleges and universities respond to sexual assault allegations for nearly 15 years. My experience began in 2006-2007, when I wrote a daily blog on the Duke lacrosse case (the blog continued with periodic posts until 2014).[2] The blog received a media credential from the North Carolina State Bar to cover the Mike Nifong ethics trial, was named the best ethics bloc by *ABA Journal* in 2007, and received favorable coverage from numerous other publications, including *New York*, *Sports Illustrated*, and *Slate*. Along with lawyer and journalist Stuart Taylor, Jr., I co-authored a

---

[2] DURHAM-IN-WONDERLAND, http://durhamwonderland.blogspot.com/.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

book on the lacrosse case; I also served as a consultant to ABC's Law & Justice Unit for the final five months of the case.[3]

A decade later, Stuart Taylor and I teamed for another book, examining due process and fairness in Title IX adjudications.[4] I have addressed this topic as an invited speaker before the State Risk and Insurance Management Association annual conference and litigators in the field. I also have been invited to speak on the topic before college and university audiences at Columbia, Princeton, Williams, Lafayette, Ohio University, and Bucknell. I have two law review articles on the topic (forthcoming in *New York University Journal of Legislation & Public Policy*, co-authored with Samantha Harris; and published last year in *The Federalist Society Review*, co-authored with Mike Adams), two reported articles,[5] two legal commentaries,[6] and op-eds in publications including the *Washington Post*, the *Wall Street Journal*, the *Los Angeles Times*, *Real Clear Politics,* and *USA Today*.[7]

**I. Policy Background**

Title IX, which Congress passed in 1972, stated that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."[8] Not until 25 years later, however, did the Office for Civil Rights (OCR) interpret the measure as having any relevance to student-on-student allegations of sexual misconduct. Title IX guidance issued in 1997 required colleges to adjudicate sexual assault allegations. ("In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis."[9]) The

---

[3] STUART TAYLOR JR. & KC JOHNSON, UNTIL PROVEN INNOCENT (2007).
[4] KC JOHNSON & STUART TAYLOR JR., CAMPUS RAPE FRENZY (2017).
[5] KC Johnson, *The Campus Sex Crimes Tribunals Are Losing*, COMMENTARY, Sept. 2017, https://www.commentarymagazine.com/articles/campus-sex-crime-tribunals-losing/; KC Johnson and Stuart Taylor, *The Title IX Training Travesty,* WEEKLY STANDARD, Nov. 10, 2017, https://www.weeklystandard.com/kc-johnson-and-stuart-taylor-jr/the-title-ix-training-travesty.
[6] KC Johnson, *How American College Campuses Have Become Anti-Due Process*, BACKGROUNDER ON LEGAL ISSUES, HERITAGE FOUNDATION (August 2016).; KC Johnson and Mike Adams, *The Student Right to Counsel*, THE FEDERALIST SOCIETY REVIEW 19 (2018), pp. 42-49, https://fedsoc-cms-public.s3.amazonaws.com/update/pdf/1sgbrv0yJnicBhi7sAW5mr6NAIhyoZ4Zs01p1cNx.pdf.
[7] I have been hired as an expert in lawsuits against Rollins College and Syracuse University; my hourly rate is $250.
[8] 20 U.S.C. § 1681.
[9] Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997).

guidance did not explain how or why OCR had reached this conclusion, nor did it dictate specific procedures that the institution should use.

Two years later, in 1999, the Supreme Court ruled that schools violated Title IX if they had knowledge of and were deliberately indifferent to misconduct that was "so severe, pervasive and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."[10] OCR itself retained a broader definition of harassment ("unwelcome sexual advances"[11]). But, as the political scientist R. Shep Melnick has noted, "it was hard to see how the Department of Education could ever hope to enforce [its broader guidelines]. Never in the history of Title IX had it invoked the funding cut-off. Instead it had relied on court action to give the act its enforcement teeth. The break with the courts took that option off the table."[12]

That condition changed, however, in 2011, when OCR issued a "Dear Colleague" letter claiming authority under Title IX to dictate specific procedures that colleges needed to use in adjudicating sexual misconduct allegations.[13] Each of the letter's significant procedural changes increased the chances that an accused student would be found responsible for a sexual misconduct allegation. OCR threatened to pull federal funds from any school that did not comply.

Although the guidelines were issued without a period of notice and comment, President Obama's two OCR heads, Russlyn Ali and Catherine Lhamon, made clear they expected colleges and universities to follow them.[14] Harvard Law School professors Jacob Gersen and Jeannie Suk Gersen described the change: "The transformation of the Title IX grievance procedure over several decades wrought a corresponding transformation in the OCR's job of oversight. No

---

[10] Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 633 (1999).

[11] Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997).

[12] R. Shep Melnick, THE DEPARTMENT OF EDUCATION'S PROPOSED SEXUAL HARASSMENT RULES: LOOKING BEYOND THE RHETORIC, *Brown Center Chalkboard*, Jan. 24, 2019.

[13] Office for Civil Rights, Dep't of Educ., Dear Colleague Letter (Apr. 4, 2011), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html [hereafter Ali, Dear Colleague letter].

[14] Letter from Catherine E. Lhamon, Assistant Sec'y for Civil Rights, to Sen. James Lankford, Chair, Subcomm. on Regulatory Affairs & Fed. Mgmt. (Feb. 17, 2016), http://www.chronicle.com/items/biz/pdf/DEPT.%20of%20EDUCATION%20RESPONSE%20TO%20LANKFORD%20LETTER%202-17-16.pdf.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

longer was it simply monitoring whether schools were engaging in discriminatory acts. Rather, OCR's task became specifying . . . schools' policies, procedures, and organizational forms."[15]

As this court astutely observed in another of its opinions on this issue, the Dear Colleague letter "generally signaled that OCR had adopted a 'get tough' approach, thus prompting colleges and universities to devote more attention to sexual assault accusations."[16] Rhetoric from Ali and Lhamon made this point clear. In a representative comment, Lhamon bluntly stated, "If a school refuses to comply with [OCR's interpretation of] Title IX in any respect, I will enforce."[17]

OCR intensified the pressure through Title IX investigations of individual schools.[18] In a critical move that she did not reveal to the public, Lhamon altered OCR policy from one based on investigating only the case that generated an initial complaint to one that reviewed all sexual assault adjudications at the school for a three-year span. This move dramatically increased the burden (financial and otherwise) for a university under investigation, even if the school had done nothing wrong, and therefore dramatically increased the incentive on colleges to handle individual cases in such a way that would minimize any risk of a complainant filing an OCR complaint in the first place.[19]

In 2014, NPR asked University of Maine Dean Robert Dana whether this federal pressure increased the chances of universities rushing to judgment. He replied, "I expect that that can't help but be true. Colleges and universities are getting very jittery about it."[20] The few

---

[15] Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CAL. L. REV. 881, 902 (2016), http://www.californialawreview.org/wp-content/uploads/2016/09/Gersen-and-Suk-37-FINAL.pdf.

[16] Doe v. Univ. of Colo., 255 F. Supp. 3d 1064, 1067 (D. Colo. May 26, 2017).

[17] Meredith Clark, *Official to colleges: Fix sexual assault or lose funding*, MSNBC.com, July 15, 2014, http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouthcollege#51832.

[18] *Title IX: Tracking Sexual Assault Investigations*, CHRON. HIGHER EDUC., https://projects.chronicle.com/titleix.

[19] Tyler Kingkade, *The Trump Administration Inherited Hundreds of Unresolved Title IX Complaints*, BUZZFEED, Mar. 6, 2017, https://www.buzzfeed.com/tylerkingkade/heres-why-so-many-title-ix-complaints-are-taking-years-to-be.

[20] Tovia Smith, *Some Accused of Sexual Assault on Campus Say System Works Against Them*, NPR, Sept. 3, 2014, https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-system-works-against-them. For more on the effects of this atmosphere, see Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. KY. L. REV. 49 (2013), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2126340.

universities that attempted to publicly resist OCR's pressure quickly retreated in face of protests from campus groups and criticism from the media.[21]

**II. CU Campus Climate, 2013-2016**

The University of Colorado was hardly immune from this federal pressure. In 2013, a female undergraduate named Sarah Gilchriese filed an OCR complaint, alleging the university had mishandled her case. (The respondent in her case was found responsible and suspended, but Gilchriese claimed that the five-week sanctioning process took too long.) During the Obama years, hundreds of campus accusers filed Title IX complaints with OCR. In some instances—the Larry Nasser case at Michigan State providing perhaps the best example—these complaints revealed serious misconduct by the school.

Gilchriese's was not one of those complaints—the delay appears to have been caused by a combination of a scheduling fluke (one of the pre-notification weeks was spring break) and routine bureaucratic inertia. Even as the Gilchriese complaint placed CU in OCR head Lhamon's cross-hairs,[22] OCR would ultimately conclude that Colorado had done nothing wrong.

In private, CU aggressively (and quite reasonably) defended its handling of the Gilchriese complaint. It assured OCR that "CU-Boulder fully complied with its obligations under Title IX."[23] The university maintained that it "took immediate and equitable action" to remedy any discrimination, and completed all aspects of the adjudication, including the notification, within the 60-day timeframe desired by the Obama-era OCR.[24]

In public, however, CU Chancellor Philip DiStefano used the complaint to launch a public relations campaign highlighting his administration's commitment to cracking down on campus sexual violence. Within three days of the complaint, DiStefano hired an outside law firm, Pepper Hamilton, to review the university's Title IX policies.

---

[21] Tyler Kingkade, *Tufts University Backs Down on Standoff with Feds Over Sexual Assault Policies,*
HUFFINGTON POST, May 19, 2014, https://www.huffingtonpost.com/2014/05/09/tufts-sexual-assault-title-ix_n_5297535.html.
[22] Sarah Kuta, *Two Years Into Federal Investigation CU Boulder Forging Ahead on Title IX*, DAILY CAMERA, July 24, 2015, https://www.dailycamera.com/2015/07/24/two-years-into-federal-investigation-cu-boulder-forging-ahead-on-title-ix/
[23] Michele Krech to OCR Regional Office, July 15, 2013, Messeri/CU 1518.
[24] *Id.*

University background material for work with Pepper Hamilton team indicated virtually no (or none at all, depending on the official) concern with the rights of accused students or the need for Colorado, as a public institution, to have a disciplinary process that conformed to the due process principles of the Constitution. The document below provided a typical list of concerns.[25]

**CCW Questions for the External Review Firm**

1. ODH and Student Conduct are completely separate entities and how can we more merge or increase working in cooperation?
2. How can we better address retaliation?
3. Sanctions for employees are up to supervisors - ODH cannot directly sanction - is that the best practice?
4. What is our plan to communicate understanding and perhaps strengthening resources between CU and local police departments?
5. Are we adequately informing our students/victims (or bystanders) about processes of reporting? Student training and awareness should make clear students can file a police report without pressing charges.
6. What might be unintended consequences of a mandatory expulsion be?
7. How do we increase understanding of what would actually lead to expulsion?
8. What steps can we take to increase training for CUPD and Boulder PD on meeting standards for responding to sexual assault? What is the extent of this training? How do these departments collaborate?
9. What are some strategies we can use to increase the overall campus perception of zero tolerance of sexual assault? (perhaps 100% tolerance for bystander intervention and reporting)
10. The University took a very strong position on 4/20. How can the university deliver a similar message around sexual assault?
11. What additional steps can we take to identify and stop repeat offenders?
12. While offline training serves some purposes, the interactive training provides an opportunity for greater engagement. What opportunities do we have and what resources will it take to provide more interactive training? Can we explore the faculty peer training?
13. How can we clarify language around differences between campus and police investigations and prosecution?
14. What more do we need to do beyond education and training to change human behavior and the campus culture in this regard?
15. What would be the best way to increase the capacity for active bystanders? And for more training not just in bystander intervention but in other responses?
16. Should we ask this review team to meet with us? Is that a possibility?

Indeed, notes of one CU administrator indicates that the September 24, 2013 session with the Pepper Hamilton team discussed how "more process doesn't necessarily lead to better

---

[25] CCW Questions for External Research Firm, n.d., Messeri/CU 699.

outcomes"—with the troubling suggestion that limiting the accused student's procedural protections could be seen as a matter of "fairness."[26]

Pepper Hamilton seemed to reciprocate the sentiment. Training for CU officials spoke of a "paradigm shift" following the Dear Colleague letter.[27] The shift made no mention of the rights of the accused, including due process rights at public universities. And, troublingly, it used complainant, victim, and survivor as interchangeable terms (praising their courage for speaking out)—even though, of course, not all complainants are survivors, and it takes no courage at all for a student to file a false complaint.




Notes from Pepper Hamilton sessions also featured the CU notetaker referring to those students found responsible as "perps"—an odd term given the university's claims that its Title IX process was educational rather than punitive. Ironically, the document conceded the "long-term consequences of a finding" of responsibility—which would seem to demand more robust, rather than fewer, procedural protections. This inconsistency was never explored in any of the CU meetings.[28]

---

[26] NOTES OF CAMPUS REVIEW, Messeri/CU 905.
[27] The Paradigm Shift, Pepper Hamilton, Messeri/CU 1228.
[28] *Conference ke re Title IX 7/30/2013*, NOTES OF CAMPUS REVIEW, Messeri/CU 903.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

*Resources for survivors*

*Consequences for perps*

You will be sanctioned

Cops will be called

Long-term consequences of a finding

Pepper Hamilton produced a lengthy letter recommending a variety of structural changes to the CU system. Many recommendations were technical or common-sense suggestions. But the letter also urged the university to adopt differential standards regarding the sexual histories of complainants ("prohibition against prior use of sexual history") and respondents ("standards for the use of pattern evidence . . . by the respondent").[29]

DiStefano took to video (at https://www.youtube.com/watch?time_continue=2&v=R1no9Fku6eg) to announce his acceptance of the review's key recommendations. He accepted Pepper Hamilton's recommendation that CU hire a Title IX coordinator. The new coordinator, Valerie Simons, previously had served as a Justice Department civil rights attorney before branching off into private practice, focusing on civil rights questions.[30] Echoing DiStefano's remarks about CU and the issue of campus sexual assault, Simons indicated a commitment to having CU "becom[e] a national model in this area."[31]

Simons' background typified the new wave of Title IX coordinators appointed during the mid-2010s. As CU-Boulder Law Professor Aya Gruber has noted, "Most investigators in college Title IX offices are not sexist lay persons whose prejudices against loose women must be strictly policed by unique evidentiary and substantive rules. Rather, they are self-selecting women's rights advocates, former civil rights enforcers, and others deeply concerned with student safety

[29] Gina Maisto Smith and Leslie Gomez to Catherine Shea (draft), Jan. 23, 2014, Messeri/CU 743.

[30] *CU-Boulder moves forward on Title IX officer with appointment of Valerie Simons*, CU BOULDER TODAY, June 10, 2014, https://www.colorado.edu/today/2014/06/10/cu-boulder-moves-forward-title-ix-officer-appointment-valerie-simons.

[31] Valerie Simons to OCR Regional Office, July 30, 2015, Messeri/CU 2963.

and gender equality."[32] Universities rarely look for former criminal defense attorneys, or civil liberties activists, to head their Title IX offices.

As one her first major responsibilities, Simons oversaw a university Task Force to respond to the White House's the "It's On Us" initiative.[33] (The goals of the initiative are discussed in greater detail below, in Section IV.) The seven-person committee included six women and one man (the Vice Chancellor for Diversity); among its members were the CU chief of police and the director of CU's Office of Victim Assistance. The Task Force did not include a defense attorney, civil libertarian, or figure whose job was to represent the interests of accused students. As in the response to the Pepper Hamilton report, the charge to the Task Force expressed no concern with the rights of accused students. Nor did the charge acknowledge that the university, as a public institution, needed to have a disciplinary process that conformed to the due process principles of the Constitution.[34]

Simons' approach to campus sexual assault seemed to reflect the broader campus culture. A few months after she arrived at CU-Boulder, the issue of campus sexual assault received unprecedented national attention. Sabrina Rubin Erdely's "A Rape on Campus" exposed a horrific assault by UVA fraternity brothers against a deeply sympathetic female undergraduate, "Jackie."[35] Even worse, according to the *Rolling Stone* article, the UVA administration was indifferent to Jackie's plight.[36] Unfortunately for Erdely and the magazine, the story soon collapsed: "Jackie," it turns out, was a fabulist, and her story appears to have been an elaborate catfishing scheme to win the romantic interest of a male anti-rape activist.[37]

Student opinion leaders at CU-Boulder, however, responded differently. The opinion section editor of the campus newspaper, the *Colorado Independent,* ran a column maintaining that "no matter the inconsistencies, it is clear that Jackie did experience some degree of sexual

---

[32] Aya Gruber, *Rape Law Revisited*, 13 Ohio St. J. of Crim. Law 279 (2016), https://kb.osu.edu/bitstream/handle/1811/77943/OSJCL_V13N2_279.pdf

[33] Valerie Simons to OCR Regional Office, July 30, 2015, Messeri/CU 2963 (discussing Simons' role overseeing the Task Force).

[34] CHARGE TO TASK FORCE ON WHITE HOUSE REPORT TO PROTECT STUDENTS FROM SEXUAL ASSAULT, 2014, Messeri/CU 2856.

[35] Sabrina Rubin Erdely, *A Rape on Campus: A Brutal Assault and Struggle for Justice at UVA*, ROLLING STONE, Nov. 19, 2014, http://web.archive.org/web/20141119200349/http://www.rollingstone.com/culture/features/a-rape-on-campus-20141119.

[36] *Id.*

[37] Johnson and Taylor, CAMPUS RAPE FRENZY, at 245-7.

assault."[38] (The editor explained away the inconsistencies by citing the trauma-informed training about sexual assault that he had received.) The piece's remarkable conclusion: "Even if we were to prove that Jackie flatly lied about the details, the fact still stands that she experienced trauma that night."[39]

Such sentiments also appeared in the political environment in which CU existed. In a September 2015 House hearing about campus sexual assault, the Boulder district's then-U.S. Representative, Jared Polis, declared, "It seems like we ought to provide more of a legal framework, then, that allows a reasonable likelihood standard or a preponderance of evidence standard."[40] (Earlier in the hearing, Polis had defined a reasonable likelihood standard as "only a 20 or 30 percent chance that it happened."[41]) The congressman continued: "If there are 10 people who have been accused, and under a reasonable likelihood standard maybe one or two did it, it seems better to get rid of all 10 people. We're not talking about depriving them of life or liberty, we're talking about them being transferred to another university, for crying out loud."[42] (An excerpt of Polis' remarks can be found in the Report Video document, and also online at https://www.youtube.com/watch?v=LwGa17f4KFc.)

In a follow-up interview with journalist Robby Soave, Polis indicated that he saw no due process rights at all for accused students at public universities like CU. (To the best of my "I associate 'due process,'" he stated, "with a conviction of criminal penalty; what affirmative right do I have to pay a university and make them deliver courses to me?"[43] For a student who was falsely accused, even at a public university, Polis had a blunt message: rather than contest the allegation, they should "do their best to put it behind them and move on."[44]

It's true that at the time Polis delivered these remarks, he was merely CU's congressman, and not governor of the state. But his political ambitions were widely known, and the message he sent to the state's universities was unmistakable.

---

[38] Ellis Arnold, *Opinion: The media, Rolling Stone and the rampant sexual assault issue at our universities*, CU INDEPENDENT, Dec. 15, 2014, https://cuindependent.com/2014/12/15/opinion-media-rolling-stone-rampant-sexual-assault-issue-universities/,
[39] *Id.*
[40] https://www.c-span.org/video/?c4550506/jared-polis-campus-sexual-assault-hearing.
[41] *Id.*
[42] *Id.*
[43] Robby Soave, *Rep. Jared Polis Thinks Colleges Should Be Able to Expel Students When They're Only 20% Sure a Rape Happened*, REASON, Sept. 10, 2015, https://reason.com/2015/09/10/rep-jared-polis-thinks-colleges-should-b/.
[44] *Id.*

In this atmosphere, Title IX Coordinator Simons oversaw a "campus climate" survey, to determine the purported rate of sexual assault on CU-Boulder's campus. The survey returned a staggering figure of 28 percent of female undergraduates who said they were victims of sexual assault.[45] Was this figure, however, related to the survey's design? At the time, Professor Gruber perceptively noted that the survey's wording "makes any sexual contact at any time possible grounds for sexual assault. For example, if I had sexual contact and decided later I did not want it, this survey could constitute that sexual assault, regardless of whether the person who did the contact had reasonable belief to assume that it was wanted. This survey does not account for the person who initiated the contact who could reasonably believe it was wanted."[46]

Coordinator Simons, however, wasn't open to such criticism. She responded to Gruber's critique only by remarking, "We do have a sexual assault problem on campus, a very serious one."[47] There's nothing in the public domain, however, suggesting that Simons considered the issue "serious" enough to urge an increased presence by law enforcement on the CU campus.

The school's treatment of "perps," however, did become noticeably more punitive after the OCR complaint was filed—raising the possibility that CU punished students at least in part to appease OCR and avoid public criticism.[48]

Between 2011 and spring 2013, CU found 16 students responsible for sexual misconduct (including harassment) of some type. Only one of the 16 was expelled—and this student was found responsible for non-consensual sexual intercourse, non-consensual sexual contact, and sexual exploitation *while on probation for another offense*.[49] The university gave suspensions (including in one case for less than a calendar year) in other cases with non-consensual sexual intercourse.[50] In the five years after the policy changes that flowed from the OCR complaint, by contrast, at least 34 expulsions (all of male students) occurred.[51]

---

[45] Sarah Kuta, *Survey: 28% of CU's Female Undergrads Sexually Assaulted While in College*, DAILY CAMERA, Feb. 9, 2016, https://www.dailycamera.com/2016/02/09/survey-28-of-cu-boulders-female-undergrads-sexually-assaulted-while-in-college/.

[46] *Inside CU's attempt to combat on-campus sexual assault*, https://cuindependent.com/2016/04/26/inside-cus-attempt-to-combat-on-campus-sexual-assault/

[47] *Id.*

[48] Doe v. Columbia Univ., 831 F.3d 46, 58 n. 11 (2d Cir. 2016).

[49] Case 31073, OSC SEXUAL MISCONDUCT CASES 6/18/11-6/18/13 RESPONSIBLE FINDINGS FOR PROVISIONS, Messeri/CU 1752-5.

[50] OSC SEXUAL MISCONDUCT CASES 6/18/11-6/18/13 RESPONSIBLE FINDINGS FOR PROVISIONS, Messeri/CU 1752-5.

[51] Messeri/CU, Interrogatory 1 response, All SM Student cases for OUC.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

**III. Campus Culture: The Barnett Case**

DiStefano responded to the OCR inquiry by promising to become a national leader on the issue of adjudications of campus sexual assault. By 2015, he claimed that "we're doing much more than we've done in the past."[52] The university spokesman boasted of CU being "months ahead of the curve" in anticipating Obama administration demands, and looking to "really set an example for our peers."[53]

As these developments were occurring, however, a highly unusual campus incident tested the administration's commitment to impartial evaluation of evidence, and provided a troubling window into how the DiStefano-era CU handled sexual misconduct allegations.

On January 22, 2013, an investigation by CU employees had concluded that a male philosophy student—who had since been hired as a lecturer—sexually assaulted a female philosophy student. The incident occurred during an alcohol-fueled August 2012 party at a home the male student shared with several other graduate students. The male student was removed from his teaching position and permanently barred from campus—a severe punishment that reflected CU's increasingly draconian approach to the question.

All parties had been drinking heavily. The facts of the case seemed ambiguous—but that often occurs in campus sexual assault cases. (The male student denied that any sexual contact occurred.) The case was handled by the Office of Discrimination and Harassment (ODH), a forerunner of OIEC. ODH investigators spoke with the two students and a number of other students who attended the party, lived in the house, or in some way had interacted with the complainant. No hearing occurred, and the male student's access to evidence purportedly gathered in the investigation was severely limited.

ODH issued a finding of responsibility. The accused student's advisor, Professor David Barnett, then spoke to the witnesses in the original case. He discovered *21* occasions of witnesses claiming that their testimony had been misrepresented by Colorado investigators. Barnett also learned that one of the witnesses—a male student in the house—described an interaction with the female accuser that constituted *her* sexually assaulting *him*, at least by the university's

---

[52] Sarah Kuta, *Two Years into Federal Investigation, CU Boulder Forging Ahead on Title IX*, DAILY CAMERA, July 24, 2015, https://www.dailycamera.com/2015/07/24/two-years-into-federal-investigation-cu-boulder-forging-ahead-on-title-ix/

[53] Sarah Kuta, *CU-Boulder Seeks to Lead in Implementing Federal Laws to Protect Women*, DAILY CAMERA, Jan. 20, 2014.

definition. ODH investigators allegedly had been indifferent to the male student's experience, even though he allegedly told them about it in their interview.

Barnett, in effect, was functioning as a whistleblower. He wrote up his findings in a lengthy report, which he sent to DiStefano as the OCR inquiry was occurring. Instead of reviewing the merits of Barrett's allegations, the DiStefano launched an effort to fire him, claiming that he was engaged in "retaliation" against the female complainant. As Northwestern professor Laura Kipnis would later note, Barnett's experience with the CU administration was "a walking illustration of the perils of sticking your neck out" to argue for fairness in Title IX adjudications.[54]

When the complainant learned of Barnett's efforts, she threatened to sue the university. On October 7, 2014, DiStefano authorized her a settlement payment of $825,000—before she had even filed a lawsuit. "A young woman's life was turned upside down and her education suffered serious interruptions. I wanted to ensure we responded quickly to help her set her life back on course . . . We settled her claim because it was the right thing to do."[55] (At the time of these words, DiStefano was speaking of a student against whom an uninvestigated allegation of sexual assault existed.) Colorado also sought to terminate Barnett, who eventually resigned his post after a $290,000 settlement.

No evidence exists that DiStefano took seriously the concerns raised in Barnett's memo about ODH's allegedly biased investigation. But Title IX required the University to investigate at least one element of the information uncovered by Barnett—the claim of the other male student that the female accuser had sexually assaulted him. So CU hired an outside law firm, whose follow-up investigation—the results of which Colorado never made public—revealed that, indeed, the female *accuser*, the same person to whom the university had preemptively paid $825,000, had committed sexual assault at the party.[56]

In the post-2013 environment at CU, that finding seemed certain to result in either an expulsion or a very lengthy suspension. But DiStefano had already publicly sided with this student, and reversing himself might have exposed him to allegations of insensitivity against a female student. The university let her off with a token punishment (probation) while seeming to

[54] Laura Kipnis, UNWANTED ADVANCES: SEXUAL PARANOIA COMES TO CAMPUS (2017).
[55] Raquel Villanueva, *$825K settlement in CU sexual misconduct case*, 9NEWS.COM, Aug. 7, 2014, https://www.9news.com/article/news/education/825k-settlement-in-cu-sexual-misconduct-case/249849261.
[56] Kipnis, UNWANTED ADVANCES.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

pressure the male student—who, according to the university's own investigation, was a sexual assault victim—against speaking out.[57]

The treatment of the female student who committed sexual misconduct in the Barnett case reflects a pattern in how CU has handled cases with male complainants and female respondents. Between April 2014 and March 2019, CU had nine Title IX cases involving such a pairing. It found the accused student responsible only 44 percent (four of the nine cases) of the time.[58] By contrast, over the same time period, in cases with female complainants and male respondents, the male was found responsible 74 percent of the time.[59]

Of the four female students that CU found responsible, none were expelled. One received probation for intimate partner violence.[60] A second (which appears to have been the student in the Barnett case) received probation and training for nonconsensual sexual contact.[61] A third received a campus exclusion plus training for nonconsensual sexual intercourse.[62] And a fourth received a suspension for stalking—in a case where there were also court-ordered sanctions.[63]

It appears, therefore, that since the new Title IX regime came into place with the 2011 Dear Colleague letter, CU has never expelled a female student accused by a male student[64] of sexual misconduct—even as dozens of male students accused by female students were expelled for similar offenses.

None of the internal CU documents produced during the discovery process reflects on this record, or whether the University has a pattern of treating respondents found to have violated policy differently because of their gender.

**IV. OCR, Title IX, and Gender Discrimination**

---

[57] *Id.*
[58] Messeri/CU, Interrogatory 1 response, All SM Student cases for OUC, Cases 13, 33, 56, 59, 79, 83, 92, 124, and 148.
[59] *Id.*
[60] Case 13.
[61] Case 33.
[62] Case 79.
[63] Case 83.
[64] CU has expelled two female students, but in both of those cases, the complainant was also a female. Cases 32, 57.

The 2011 Dear Colleague letter and OCR's 2014 "Questions and Answers" document provided the operative Title IX guidance at the time of Messeri's case.[65] Each of the major changes demanded by the Obama administration in these guidance documents increased the chances that accused students would be found responsible. At risk of losing their federal funding, schools were told to use the preponderance of evidence standard in Title IX cases, and to allow complainants to appeal in cases where the accused were found not responsible. The guidance documents "strongly" discouraged allowing accused students to directly cross-examine their accusers (although, importantly, schools remained free to allow *lawyers* for accused students to engage in cross-examination, or allow accused students to cross-examine other witnesses—procedural protections that Colorado declined to provide Messeri). The Obama-era OCR also urged schools to complete all adjudications within 60 days, which had the effect of complicating the accused student's defense, since the student often would not receive school's evidence (or, occasionally, even notice) until well within the 60-day window.

The Dear Colleague letter reminded readers that even though OCR was using a gender discrimination law to address sexual assault allegations, men and women fell on both sides of the issue—that is, that male and female students were both victims and perpetrators. The letter asserted that 6.1 percent of male college students would be victims or attempted victims of sexual assault.[66]

In effect, Obama-era guidance used the status of *complainant* as a proxy for gender, reasoning that campus procedures insufficiently protective of the interests of student complainants violated Title IX—even though not all victims of campus sexual assault were female. (This reasoning, of course, would imply that policies found too tilted toward the rights of accusers also could violate Title IX—as recognized in the new regulations proposed by Education Secretary Betsy DeVos.[67]) A 2014 resolution letter from OCR to Harvard Law School provided perhaps the clearest articulation of the line of argument that procedures insufficiently

---

[65] Letter from Russlynn Ali, Assistant Sec'y, Office for Civil Rights, U.S. Dep't of Educ., to Colleague (Apr. 4, 2011), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf [hereinafter "Ali, Dear Colleague Letter"]; OFFICE FOR CIVIL RIGHTS, U.S. DEP'T OF EDUC., QUESTIONS AND ANSWERS ON TITLE IX AND SEXUAL VIOLENCE (2014), https://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.
[66] Ali, Dear Colleague letter, at 2.
[67] OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION, Notice of Proposed Rulemaking, Docket ID ED-2018-OCR-0064 (Nov. 16, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

protective of complainants (of either gender), rather than discrimination against women, violated Title IX in this context.[68]

Some Obama officials and initiatives, however, framed the issue in explicitly gendered terms, deeming campus sexual assault as an offense involving solely *male* victimizers and solely *female* victims. For instance, the first report of the White House Task Force to Protect Students from Sexual Assault, issued in April 2014, led with the statement that "[o]ne in five women is sexually assaulted in college."[69] It did not mention male victims. In 2017 discussions recalling the administration's approach, former Vice President Joe Biden described campus sexual assault as an issue in which perpetrators were solely male and victims solely female.[70] The administration, he recalled, wanted to "*get men involved," since "*if you see a brother taking a drunk freshman coed up the stairs to his room and you do nothing, you're a coward . . .You know that she's not able to give consent."[71]

The White House "It's On Us" initiative maintained, "Most *men* are not comfortable with violence against *women*, but often don't speak out because they believe that other *men* accept this behavior. By getting *men* involved, we can change this way of thinking and create new social norms."[72] [emphasis added]

The Biden/"It's On Us" language came very close to relying on improper sex stereotypes—that most male college students were either potential rapists or were indifferent to this horrifying offense. This is precisely the sort of bias that Title IX is supposed to eradicate in the educational arena. And this is precisely the type of bias that made its way to Boulder in spring 2016.

---

[68] Joel Berner to Dean Martha Minow, re: OCR Complaint No. 01-11-2002, Dec. 30, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf.
[69] *Not Alone: The First Report of the White House Task Force to Protect Students from Sexual Assault*, Apr. 2014, *https://www.justice.gov/archives/ovw/page/file/905942/download*.
[70] Chelsea Bailey, *Joe Biden Speaks Bluntly About Rape on College Campus*, NBCNEWS, Apr. 27, 2017, https://www.nbcnews.com/news/us-news/joe-biden-speaks-bluntly-about-rape-college-campus-n751956. https://www.teenvogue.com/story/vice-president-joe-biden-interview
[71] Vera Papisova, *Joe Biden Interview on Rape Culture and Campus Sexual Assault,* TEEN VOGUE, Apr. 14, 2017, https://www.teenvogue.com/story/vice-president-joe-biden-interview, (emphasis in original).
[72] Office of the Press Secretary, Fact Sheet: Launch of the "It's on Us" Public Awareness Campaign to Help Prevent Campus Sexual Assault (2014), https://obamawhitehouse.archives.gov/the-press-office/2014/09/19/fact-sheet-launch-it-s-us-public-awareness-campaign-help-prevent-campus-.

**V. Vice President Biden Comes to Boulder, April 2016**

In the months before the Messeri case, Colorado—whose senior officials, including the Chancellor, had repeatedly stated their desire to become a national leader on how to adjudicate sexual misconduct cases—aggressively embraced the "It's On Us" agenda, despite the program's problematic assumptions about gender. In October 2014, the university produced a video in which administrators, professors, students, and student-athletes spoke. The message, as articulated by one of the student speakers: "It's on us to make sure *guys* know that if *she* does not or cannot consent to sex, it's sexual assault."[73] The video contained no mention of sexual assaults with male students as victims or female students as perpetrators.

On April 8, 2016, a few months before the incidents in the Messeri case, the university welcomed then-Vice President Biden to campus, as part of Colorado's "It's On Us Week of Action."[74] Biden's message was explicitly gendered: "Guys, look in the mirror and ask yourself, 'Are you being the man you think you are? . . .. I know it takes courage. You're worried about being socially ostracized by your *fraternity brothers* or the team or whatever. We have to change the dynamic and socially ostracize the abusers."[75] "No one," he added, "has a right to put a hand on a *woman* for any reason."[76]

Women, meanwhile, were portrayed exclusively as victims. Biden addressed them: "Studies show your classmates who are raped or abused, you know where they go? Two-thirds of them go to you. They report to their roommate or tell their friends they go to class with. They tell their *sorority sisters*."[77]

All of this, the Vice President asserted, flowed from a legacy of unfair treatment of women. As recently as the late 1980s, he contended, "in the court of public opinion, we were still back in the 18th century."[78] His voice rising, he attacked a system in which "prosecutors were able to ask,

---

[73] University of Colorado Boulder "It's On Us" Sexual Assault Prevention Video, Oct. 28, 2014, https://www.youtube.com/watch?v=kh9K74JiqAA (accessed June 11, 2019).
[74] Univ. of Colorado, VICE PRESIDENT BIDEN TO SPEAK AT CU-BOULDER DURING 'IT'S ON US WEEK OF ACTION', https://www.cu.edu/news/vice-president-biden-speak-cu-boulder-during-%E2%80%98it%E2%80%99s-us-week-action%E2%80%99 (accessed June 11, 2019).
[75] Sarah Kuta, *In CU Visit, Joe Biden Delivers Forceful Plea to End Campus Sexual Assault,* DAILY CAMERA, Apr. 8, 2016, https://www.dailycamera.com/2016/04/08/in-cu-visit-joe-biden-delivers-forceful-plea-to-end-campus-sexual-assault/.
[76] *Id.*
[77] *Id.*
[78] https://www.youtube.com/watch?v=HSkJsa2f3gs

'How short was your *skirt*? Were you *wearing a bra*? What did you say to *him*?'"[79] Directly addressing the students, Biden claimed, "I bet most of you know somebody—a friend—whose father would smack his around."[80] This situation was unsurprising, since "deep buried in the psyche of our culture was the idea that if it wasn't someone leaping out of an alley, unknown and brutally raping a *woman*, somehow the *woman* must have done something wrong—an idea that still lingers today *mother*."[81] [emphases added throughout three paragraphs above]

Given his gender-based passion, Biden said people often wondered, "Was my *mother* or my *wife* or my *sister* raped or abused? Thank God, no."[82] [emphasis added] Biden had two sons; it does not appear that the prospect that they could be victimized ever crossed his mind. For a sample of the Vice President's gendered language, see the video excerpt in the Report Video document, or online at https://www.youtube.com/watch?v=kGhQMRVD0i8.

The Vice President's CU speech framed the administration's Title IX policies as part of a long line of initiatives he had supported that sought to improve the lot of *women as a class.* Before his CU audience, he linked the administration's Title IX policies to efforts to "protect a woman's right to choose," achieve equal pay for women in the workplace, and pass the Violence Against Women Act.[83]

Biden expanded on that theme a bit later in the day, in a Boulder video interview with *Mic*. Once again, he presented his (and the administration's) view of campus sexual assault through an exclusively gendered prism. His goal, he said, was to "the message to send out to college students . . . to change the culture on campuses, so that *women* are no longer blamed."[84] He added, "There's never a circumstance where a *woman's* assaulted, where it's her fault. Never . . . This culture of ours is upside-down; we've got to change it."[85] Colleges needed to change the culture so that "no *woman* asks the question, 'What did I do?'"[86] The Vice President compared campus sexual assault to a toxin: "Universities can do something about it . . . They can put together an environment when a *woman* has a chance to say what happened to *her*. Let *her* have the choice

[79] *Id.*
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*
[84] https://www.youtube.com/watch?v=Vkh_cY3-aTw
[85] *Id.*
[86] *Id.*

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

what to do, but give her guidance."[87] Biden even said he'd support Justice Department action, under civil rights laws, against some fraternities. [emphases added]

Why, he was asked, did universities take the issue more seriously? "What happens if at XYZ University, they find out that there are *x* number of *women* who get assaulted every year on campus?"[88] The Vice President said that the administration would define the success of its Title IX policies "when there's not a single *woman* who's been abused ever asks herself, 'What did I do?'" As a result, a new campus environment would be created—one in which "it is never, never, never the *woman's* fault."[89] [emphasis added]

The latter culture, of course, would not eradicate campus sexual assault, since (as the Education Department's guidance documents conceded) there are some instances when it *is* "the woman's fault"—when the female student is the *culprit* and the male student the *victim*. For Biden, at least based on his comments in Boulder, those cases *never* occurred. The issue of campus sexual assault and Title IX, instead, was exclusively gendered, with male victimizers and female victims, part of a broader pattern of legislation to support the rights of women as a class—from choice in abortion rights to discrimination in the workplace to violence against women.

In his speech, Biden praised the efforts of Chancellor DiStefano. Not all college administrators, he asserted, were "as good" as DiStefano on this issue.[90] Shortly after the Vice President departed Boulder, the University's communications staff uploaded a video with excerpts of his speech to the official university YouTube channel.[91]

The university also wanted its alumni to learn of Biden's gender-based conception of Title IX and campus sexual assault. The *Colorado Alumni Magazine* summarized Biden's visit. Prominent was the Vice President's urging students to intervene if they saw a sexual assault in progress. "Look in the mirror, look in the mirror and ask, are you being the *man* you think you are? . . . That's the character test you're going to have to pass."[92] [emphasis added] The alumni article offered statistics on the alleged rate of sexual assault against female undergraduates; it did not mention male students as potential victims.

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] Sarah Kuta, *In CU Visit, Joe Biden Delivers Forceful Plea to End Campus Sexual Assault,* DAILY CAMERA, Apr. 8, 2016, https://www.dailycamera.com/2016/04/08/in-cu-visit-joe-biden-delivers-forceful-plea-to-end-campus-sexual-assault/ (accessed June 11, 2019).
[91] https://www.youtube.com/watch?v=qT62OT3yYcw
[92] Eric Gerschon, *VP Biden, at CU, issues "test of character,"* COLORADAN ALUMNI MAGAZINE, Apr. 9, 2016, https://www.colorado.edu/coloradan/2016/04/08/vp-biden-cu-issues-test-character

One question in interpreting the nexus between Title IX and sexual assault is whether procedures that discriminate against accused students should be considered violations of Title IX. Courts have divided on the question.[93] But in Biden's University of Colorado speech, the policy he described—that the Obama-Biden administration had mandated and whose local implementation explained why DiStefano was "good" on this issue—had no distinction: all male students were potential perpetrators, all female students were potential victims, and sexual assault was an offense that only happened to women.

**VI. CU-Boulder's Campus Culture, May-August 2016**

As the Vice President departed Boulder, the university seemed to have fully embraced Biden's gendered view of campus sexual assault. Then came a local incident that substantially heightened the pressure on CU to crack down on accused campus males.

In May 2016, former CU student Austin Wilkerson was found guilty of sexually assaulting a heavily intoxicated fellow student. "This news," student reporter Jake Mauff admitted, "comes at a tumultuous time for the Boulder campus.[94] Wilkerson previously had gone through a Title IX process at CU; he was found responsible and suspended, but not expelled.

The Wilkerson controversy remained in the news throughout the summer of 2016, as the trial court considered sentencing. At Wilkerson's sentencing hearing, the prosecutor, the judge, the victim, and the defendant himself all brought up Coordinator Simons' "campus climate" survey in which 28 percent of Colorado *female* undergraduates said they had been victims of sexual assault. Wilkerson told the court, "I'm sorry I have perpetrated the cycle of sexual assault on college campus."[95] The victim said, "Our goal has been to have the rapist not perpetrate again,

---

[93] See, e.g., Doe v. Marymount Univ., 297 F. Supp. 3d 573, 584 (E.D. Va. 2018) (procedures biased against accused students "may well run afoul of Title IX" by "depriving students accused of sexual assault of the investigative and adjudicative tools necessary to clear their names even when there are no due process requirements").
[94] Jake Mauff, *No prison time for former CU student convicted of rape*, CU INDEPENDENT, Aug. 11, 2016, https://cuindependent.com/2016/08/11/prison-sentence-not-given-former-cu-student/.
[95] Mitchell Byars, *Former CU Student Convicted of Boulder Rape Spared Prison Sentence*, DAILY CAMERA, Aug. 10, 2016, https://www.dailycamera.com/2016/08/10/former-cu-student-convicted-of-boulder-rape-spared-prison-sentence/.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

which hopefully won't happen even with the light sentence. We get to put a face to the 1-in-4 statistics."[96]

The victim's impact statement sharply criticized how the University of Colorado had handled her case. "On campus I was on high alert constantly checking over my shoulder," she recalled. "Keep in mind that CU didn't have a Criminal Protection Order. All CU said was that if we crossed paths, he would have to turn and go the other way."[97] (No such confrontation occurred.) She told the judge, "Don't be like CU's director of student conduct, who had total disregard for my safety and the safety of others by allowing the rapist to go to an on-campus comedy show after he was found guilty of multiple counts of sexual assault. Please don't be like CU's director of student conduct, who suspended the rapist from CU for just over a year, meaning that he would be allowed back on campus while I was still attending. Basically, please don't be like CU's director of student conduct, who sacrificed the safety of the community in favor of the rapist's pleasure."[98] The Wilkerson victim explicitly condemned the process in which she had to "relive" the event in retelling the incident "to CU-Boulder investigators" and "the DA's office."[99]

The presentencing report had recommended that Wilkerson not receive prison time.[100] Prosecutors, however, demanded that Wilkerson be sent to state prison. Judge Patrick Butler rejected both suggestions and sentenced the former student to the county jail (for two years). Wilkerson also was placed on probation for at least 20 years, with a requirement to register as a sex offender.[101]

Wilkerson's sentence generated outrage on campus. One local TV reporter, in a segment on Denver7, commented that "students are adamant that the punishment in this case does not fit the crime . . . On the CU campus, you can feel the anger over the sentence of convicted rapist Austin Wilkerson . . . Many students compared the sentencing to the case of Brock Turner."[102]

---

[96] Mitchell Byars, *Woman Raped by Austin Wilkerson Calls Sentence Light but Found Legal Process Therapeutic*, DAILY CAMERA, Aug. 12, 2016, https://www.dailycamera.com/2016/08/12/woman-raped-by-austin-wilkerson-calls-sentence-light-but-found-legal-process-therapeutic/.
[97] *Id.*
[98] *Id.*
[99] *Id.*
[100] Byars, *Former CU Student,* https://www.dailycamera.com/2016/08/10/former-cu-student-convicted-of-boulder-rape-spared-prison-sentence/.
[101] Mauff, *No prison time,* https://cuindependent.com/2016/08/11/prison-sentence-not-given-former-cu-student/.
[102] https://www.youtube.com/watch?v=P305y_yQdfk.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

The report referenced the survey showing that 28 percent of undergraduate women said they were victims of sexual assault; no interviewed students expressed support for the sentence.

The sentence also generated outrage from important political figures. Boulder City Councilor Aaron Brocker maintained, "We will never make progress on sexual assault if offenders go unpunished."[103] (That a local politician didn't consider a two-year jail sentence, with 20 years of probation as a sex offender, speaks volumes as to the local attitude regarding campus sexual assault of females.) Brocker added that "many other offenders go unpunished."[104] Then-Colorado Attorney General Cynthia Coffman tweeted from her official account, "No prison time for sexual assault sends a terrible message. My thoughts are with the victim."[105]

The Wilkerson case attracted substantial national media attention to CU,[106] including in segments on ABC News[107] and CBS News.[108] Councilor Brockett, in an August 2016 interview, demanded a city-wide discussion over the matter. "We have to do everything we can to protect the young women at CU, and a light sentence like that does not send that message," the councilor said. "The fact that so many people are upset about it shows we are making some progress."[109]

**VII. CU-Boulder's Campus Culture in the Run-Up to the Messeri Allegations**

Less than one month before the Messeri case came to the attention of Colorado's Title IX office, the *Daily Camera* ran an article with the provocative title: "Boulder's Brock Turner? Austin Wilkerson case renews rape sentencing outrage."[110] (Turner was the former Stanford swimmer whose conviction for sexual assault led to a six-month sentence, triggering national condemnation and eventually the recall of the judge who handed down the sentence.) The

---

[103] https://twitter.com/AaronBrockett12/status/763545667490897921.
[104] https://twitter.com/AaronBrockett12/status/763817350915174401.
[105] https://twitter.com/COAttnyGeneral/status/763791345357950977.
[106] Sam Levin, *No prison for Colorado college student who 'raped a helpless young woman,'* THE GUARDIAN, Aug. 10, 2016, https://www.theguardian.com/us-news/2016/aug/10/university-of-colorado-sexual-assault-austin-wilkerson.
[107] https://www.youtube.com/watch?v=vwSmizIHCI0.
[108] https://www.youtube.com/watch?v=To34Q91TmgA.
[109] Mitchell Byars, *Boulder's Brock Turner Austin Wilkerson Case: Renews Rape Sentencing Outrage*, DAILY CAMERA, Aug. 11, 2016, https://www.dailycamera.com/2016/08/11/boulders-brock-turner-austin-wilkerson-case-renews-rape-sentencing-outrage/.
[110] *Id.*

headline drew the attention of *Washington Post* education reporter Nick Anderson, who used it to frame his article on the case.[111]

Demanding harsher punishment for campus rapists, Boulder District Attorney Stan Garnett praised the outrage that had accompanied the sentence, and commented, "I'm a firm believer that we have the best justice system in the world and that it works very fairly, but one of its flaws is it gets too insulated from the real world. I think discussions like this can help everyone involved in the justice system see what myself and my deputies do all the time: That the community takes sexual assault very seriously."[112]

The fall 2016 semester—just as the university would consider Messeri's case—opened with a series of op-eds in the campus newspaper, demanding that administrators do more to crack down on sexual assault of female students. Each article listed only male attackers and female victims.

The Wilkerson sentence provided the spine for the series. Almost as if previewing the university's response to Messeri, where the criminal justice process ultimately ended in his favor, the piece demanded that "efforts at the university level must make up for flaws in the justice system and the ways in which the nation focuses on victim blaming rather than consent-education when it comes to rape."[113] Columnist Emily McPeak surveyed Chancellor DiStefano's efforts, but maintained that "it is unclear whether the university has done anything that will truly be effective, especially considering the far too lenient punishments rapists like Wilkerson seem receive for their crimes."[114] Presenting no evidence for the assertion (which the actual record of CU procedures contradicted), the column concluded that "here at CU, just like in the courts, the victim of sexual assault is treated as if they hold some responsibility for the crime committed against them."[115]

The paper's August 28, 2016 survey of students' attitudes on the issue captured a snapshot of the campus environment on the eve of the Messeri case. One student complained, "I went to Montana Tech and there were the football players falsely accused of rape, and that was big all

---

[111] Nick Anderson, *Ex-Colorado Student Avoids Prison After Sex Assault Conviction*, WASHINGTON POST, Aug. 11, 2016, https://www.washingtonpost.com/news/grade-point/wp/2016/08/11/ex-colorado-student-avoids-prison-after-sex-assault-conviction/.

[112] *Id.*

[113] Emily McPeak, *The sexual assault epidemic, part one: Austin Wilkerson and flaws in CU system*, CU INDEPENDENT, Aug. 17, 2016, https://cuindependent.com/2016/08/17/sexual-assault-epidemic-part-one/

[114] *Id.*

[115] *Id.*

over the country. Those [stories] get more attention that the actual accusations."[116] Another maintained, "Most rapists don't get punished . . . I think it has to fall back on this whole manhood idea society has, that men are entitled to women. I think men get off because that whole perception that they are powerful and masculine while women are fragile and frail."[117] A third: "It's a problem on campus, of girls not feeling safe, and it's something that has to be enforced and punished…the punishment should be more jail time…there should be a minimum [jail time] so there isn't as much circumstantial stuff happening."[118] A fourth: "There's a lot more awareness now about colleges not doing much. But at the same time we don't really see any change…there's more media about it, but nothing's really changing. The school could do more."[119]

Two other students took a different view: one said that the Wilkerson sentence was appropriate; the second commented "there's a big difference between doing dumb things when they're intoxicated and a rapist pursuing the streets."[120] In contrast to the four students who demanded that the university do more and approached campus sexual assault through an exclusively gendered lens, the two dissenting students refused to allow photographs of their faces to appear in the paper.

Of the nearly 500 cases that have triggered litigation since issuance of the Dear Colleague letter, few (if any) provided as much pressure on an institution to act aggressively against an accused male student. The Vice President had come to Boulder to champion a gender-based conception of Title IX and sexual assault, and Colorado made clear a desire to implement his vision as part of Chancellor DiStefano's commitment that the school be a national leader on the issue. Then, the sentencing hearing of CU-Boulder's version of Brock Turner had led to the victim publicly denouncing CU's Title IX office as insufficiently protective of campus victims. Either of these episodes, in isolation, would have placed enormous pressure, at least in the very short term, on a Title IX office to tip the scales against the next respondent to come down the line. But both episodes, one after another?

It would be difficult to imagine, in the Title IX context, a more gender-charged atmosphere than the particular time and place of the CU-Boulder campus as the fall 2016 semester began.

---

[116] *The sexual assault epidemic, part 2: Buffs respond*, CU INDEPENDENT, Aug. 28, 2016, https://cuindependent.com/2016/08/28/sexual-assault-epidemic-part-two-buffs-street/
[117] *Id.*
[118] *Id.*
[119] *Id.*
[120] *Id.*

**VIII. Messeri's Interim Punishment**

In this highly unusual environment, Messeri (or, most likely, any accused student at the time) was especially vulnerable to precipitous action from Colorado's Title IX apparatus. On September 12, 2016, at around noon, Colorado's Title IX office, the OIEC, first received word of a sexual assault report, filed to the CU Police Department. The reporter, a non-CU student, was the alleged victim's brother.[121] The alleged victim, too, was not a Colorado student. A notation the next day confirmed that no OIEC representative had been present at Roe's initial interview.[122]

Within hours, the OIEC had imposed an interim punishment on Messeri. At the time OIEC acted, it is not clear whether the office even knew Roe's full name.[123]

The afternoon of September 12, 2016 began with OIEC receiving a second-hand report from CU Police Chief Melissa Zak that "a sex assault case was coming in."[124] Several hours later, routine processing appears to have occurred. Messeri was scheduled to come in for an interview a little after 4:00pm.[125] (No record of any interview exists in the record, and Messeri's only contact with anyone from OIEC came through e-mails.) At this point, OIEC could not have undertaken any individualized investigation of Ms. Roe's[126] allegation, since no OIEC staffer had even laid eyes on her. Nor could any OIEC employee have had any capacity to deem Roe an inherently credible party, since Roe wasn't a student at the university.

At 8:19pm, Messeri received a letter from OIEC staffer Regina Tirella explaining that the office had ordered him removed from his dorm room and restricted to certain areas on campus. A CUPD officer took him out of his dorm, in front of his roommates (and potential witnesses in the adjudication) and drove him to a hotel in a CUPD vehicle. He was forced to live in a hotel, with short-term reservations made by the university.[127] Tirella claimed that she acted "after carefully considering the known."[128]

---

[121] Regina, 9/12/2016, at 12:10pm, Messeri/CU 529 (Case Details).
[122] *Id.,* Megan, 9/13/2016, 8:00am.
[123] *Id.,* Megan, 9/13/2016, 8:00am (CUPD officer "confirming" Roe's full name).
[124] *Id.*, Regina, 9/12/2016, at 12:10pm.
[125] *Id.*, Regina, 9/12/2016, at 4:09pm.
[126] Although the complainant's name appears in the some of the case documents, I have identified her as Jane Roe in the report for privacy reasons.
[127] Regina, 9/12/2016, at 8:19pm, Messeri/CU 529 (Case Details).
[128] Tirella to Messeri, Sept. 12, 2016, Messeri/CU 92.

Tirella's letter did not identify what word or concept "known" was supposed to have modified, leaving an uncertain record of what Tirella claimed to have "known." In any case, how "carefully" could she have considered *anything*, given the paucity of information then available to OIEC? Tirella's letter did not give any sign that she had individually analyzed the specifics of the case, especially whether Messeri's continued presence in the dorms (at least for another night or two, until OIEC learned more information about the specifics) posed any threat to Roe—who, after all, was not a CU student.

According to CU's then-existing procedures, "The University will implement reasonably available measure to protect a complainant and facilitate the complainant's continued access to University employment or education programs and activities at any stage of the process."[129] (Roe was not a student and thus her access to CU educational programs were not threatened.) the regulations continued: "Protective measures, which involve restricting the rights of a respondent, may require participation in a formal investigation."[130] (No investigation—formal or informal—occurred before Messeri's rights were restricted.) Furthermore, a CU official "will meet with a complainant or respondent to address any concern about the provision of remedial or protective measures."[131] No record exists of such a meeting with Messeri.

Despite its reputation for pushing colleges to tilt their Title IX procedures in favor of complainants, the Obama-era OCR did find that one college violated Title IX for mistreating students *accused* of sexual assault.

That ruling came in a 2016 OCR resolution letter to Wesley College, in Delaware, and mostly involved the institution's handling of the student's interim punishment (that is, punishment before any adjudication took place). The case involved an allegation initially brought to Wesley's attention by a third party (not unlike the Messeri case at Colorado). The university's Title IX coordinator immediately suspended the three accused students, based solely on the allegation, without giving them any opportunity to present their side of events.

OCR found that Wesley College's actions failed to satisfy Title IX's obligation for an "equitable" investigation in multiple ways, including:

> The accused Student was not provided with the opportunity to challenge evidence that the College relied upon in imposing his interim suspension. The College imposed an interim suspension on the accused Student on the same day as the incident was reported, without conducting an interview with the accused Student, or providing him

---

[129] OIEC PROCESS AND PROCEDURES 2016-2017, at 11.
[130] *Id.*
[131] *Id.*

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

> with an opportunity to explain why the proposed interim suspension was not justified, as required by the College's Title IX Policy and Procedures. While a school must assess whether the presence of an accused student threatens the safety of individuals within the school community, a sufficient level of inquiry – that is not here evident – must be undertaken in determining the appropriateness of interim suspensions.[132]

Reflecting similar principles, the First Circuit recently addressed a case involving a five-month interim suspension of a UMass student where the university—as in the Messeri case—acted without giving the student any meaningful chance to present his side of the story. "As a general rule," the Court noted, "both notice and a hearing should precede a suspension."[133] The exceptions to this general rule, the Court continued, involved a need to act against an ongoing threat to academic progress or cases where the accused student formed a continuing danger to others on campus. The Court found that UMass had violated the accused student's due process rights by letting him issue a statement only 15 days later, which "came too late to serve as an opportunity to be heard before the suspension began."[134]

It might be argued that Messeri's interim punishment was more limited than the interim punishments in the Wesley College or UMass cases. Yet, given Messeri's particular circumstances—of which, according to the files, all relevant Colorado administrators were aware—this line of argument would be difficult to sustain. Messeri was a first-year international student. He had no support network of friends or family anywhere near Boulder.

Indeed, CU structured Messeri's interim punishment to leave him repeatedly wondering where he'd be sleeping the next night. On September 13, 2016, a "stressed" Messeri called into OIEC noting that the office—having kicked him out of his dorm after 8:00pm the previous night—had only made a one-night reservation for him.[135]

| | | |
|---|---|---|
| 9/13/2016 9:56 AM | Regina | Shigeo-<br><br>I received a vm from Giarlamo and he said his hotel reservation is only until today. Can you please extend his reservation so he has a place to stay until you all decide if/when you're terminating his housing contract?<br><br>He is stressed and I need to call him back. Please let me know how long you are extending it for.<br><br>Thank you. |

[132] Beth Gellman-Greer to President Robert Clark, Oct. 12, 2016, at 24, https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/03152329-a.pdf.
[133] Haidak v. Univ. of Mass.-Amherst, 2019 U.S. App. LEXIS 23482, *31 (1st Cir. Mass. August 6, 2019).
[134] *Id.* at *32.
[135] Regina, 9/13/2016, at 9:56am, Messeri/CU 529 (Case Details).

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

An hour later, a "frantic" Messeri called again:

| | | |
|---|---|---|
| 9/13/2016 10:43 AM | Regina | Perfect.<br><br>He just called again frantic about his room.<br><br>His number is 720-272-9192<br><br>Can someone call him and ensure him that he will have a room tonight and you're working on where that will be?<br><br>Thanks a lot. |

Two weeks later, the housing issue emerged again, due to difficulties in coordination between OIEC and the Housing Office, which had differing concerns on the issue.[136] (The investigator in the case bluntly told Messeri that she "was not involved with the decision whether he was allowed to return to the residence halls."[137]) Four e-mails, a text, and a phone call from OIEC staffers ensued over the next 24 hours as to whether Messeri would be kicked out of his hotel—again, this was a foreign student without local connections—before the university decided to extend his reservation for one day, to September 28, 2016.[138]

Only at that point did the CU bureaucracy decide that it would house Messeri through the duration of the interim punishment. The university's handling of the housing between September 12 and September 28 needlessly made Messeri "stressed" and "frantic" at a time when he already was facing a criminal investigation and a Title IX adjudication.

The one important difference between the UMass and Wesley cases on the one hand, and Messeri's on the other, raises even more questions about the Title IX ramifications of how Colorado handled the initial punishment. In the Wesley case, both the initial complainant (a professor) and the alleged victim (a student) were affiliated with Wesley. In the UMass case, the alleged victim was a student. Thus, at least in theory, interim actions against the accused students could be justified on grounds that they might encounter the complaining parties on campus, and that this encounter might block the equal access to educational opportunities that Title IX protects.

In the Messeri case, by contrast, the three parties providing adverse testimony (Roe, her brother, and her best friend) had no affiliation with Colorado. Indeed, Roe herself admitted that she rarely even set foot on the campus. That all parties associated with the complainant lacked

---

136 *Id.,* Jessie, 9/26/2016, at 1:51pm.
137 *Id.,* Jessie, 9/26/2016, at 2:27pm.
138 *Id.,* Jessie, 9/27/2016, at 11:37am.

any affiliation with the University makes all the more perplexing Tirella's decision to impose an interim punishment against Messeri.

It remains unclear *why* Tirella handled the interim punishment in the way that she did. But it did *not* come from her personal sense of Messeri or Roe—because she never met with either party before she acted. And it could not have come from a fear that Messeri's presence on campus might restrict Roe's access to educational opportunities at CU—because Roe wasn't a CU student partaking of any of these opportunities.

Perhaps Tirella acted as she did because of the training she received at Colorado. (While CU has produced lists of the training sessions that university officials received, it did not produce specifics of any on-campus training items.) Perhaps she acted from a personal bias. But it's at least plausible, and in all likelihood more than plausible, that the charged atmosphere following the Biden visit and fear of another Wilkerson case shaped how Tirella handled the Messeri interim punishment.

With Wilkerson's female victim having publicly criticized CU, in a highly emotional court statement, for not getting Wilkerson off campus when campus charges were filed, it perhaps is unsurprising that Tirella took the approach to the Messeri punishment that she did. After all, banishing Messeri without a phone call was unlikely to generate any bad press for CU. But the Wilkerson case showed how not being *aggressive enough* at the interim stage could result in negative publicity. (In the Title IX context, of course, this problem extends beyond the matter of interim punishments. As Harvard Law Professor Nancy Gertner, a former federal judge, has written, "The new standard of proof, coupled with the media pressure, effectively create[d] a presumption in favor of the woman complainant. If you find against her, you will see yourself on 60 Minutes or in an OCR investigation where your funding is at risk. If you find for her, no one is likely to complain."[139])

Unfortunately for CU, as the Seventh Circuit has recently held,

> A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex.[140]

---

[139] Nancy Gertner, *Sex, Lies, and Justice*, THE AMERICAN PROSPECT, Jan. 12, 2015, https://prospect.org/article/sex-lies-and-justice.

[140] Doe v. Purdue Univ., 2019 U.S. App. LEXIS 19464, *35 (7th Cir. Ind. June 28, 2019), quoting Doe v. Columbia Univ., 831 F.3d 46, 58 n.11 (2d Cir. 2016).

In any event, despite a lack of clarity as to Tirella's motive, how CU handled Messeri's interim punishment clearly raises concerns about inequitable treatment under Title IX of the type OCR identified in the Wesley College case.

**IX. Title IX & the CUPD Criminal Investigation**

Since the toughening of Title IX requirements in 2011, universities have gone out of their way to distinguish a campus Title IX adjudication from the criminal justice process. They have advanced a variety of arguments on this front:

> **Definitional**: Universities often use a broader definition of sexual assault than does the criminal justice system. (Compare, in this instance, UC-Boulder's sexual assault definition[141] with the substantially narrower one of the State of Colorado.[142])
>
> **Goal of Inquiry**: Universities generally maintain that unlike the criminal justice system, their goal under Title IX is preserving equal educational opportunities on campus. That justification, of course, is harder to sustain in this case, given that the complainant and her chief witness had no connection to the University of Colorado.
>
> **Educational vs. Punitive Outcomes**: Universities almost always claim that the Title IX process is primarily educational, designed simply to fulfill the school's goal of teaching students. U.S. District Judge Philip Simon deemed this line of argument "not credible," noting, "Being thrown out of school, not being permitted to graduate and forfeiting a semester's worth of tuition is 'punishment' in any reasonable sense of that term.[143]

Due process advocates, meanwhile, have pointed out that the emphasis on an "educational" mission often serves as an ill-concealed justification for not providing accused students with the procedural tools sufficient to defend themselves against a serious, quasi-criminal charge.[144]

Messeri's case, however, is a highly unusual one—in that Colorado heavily relied on the *criminal* investigation to bring its *Title IX* case against the student. Indeed, in a case that came down to a credibility judgment between the parties, University investigators did not conduct an

---

[141] OIEC, Prohibited Behaviors, https://www.colorado.edu/oiec/policies/sexual-misconduct-intimate-partner-abuse-stalking-policy/prohibited-behaviors.
[142] Colorado Revised Statutes Sections 18-3-402, https://law.justia.com/codes/colorado/2016/title-18/article-3/part-4/section-18-3-402/.
[143] Doe v. Univ. of Notre Dame, 2017 U.S. Dist. LEXIS 69645 *34-5 (N.D. Ind. May 8, 2017).
[144] Will Creeley, *Why the Office for Civil Rights' April 'Dear Colleague Letter' Was 2011's Biggest FIRE Fight*, FIRE NEWSDESK, Jan. 3, 2012.

"independent interview" with the complainant. Roe, according to the university itself, did not "wish to provide information" to them.[145] (In the draft final report, curiously, the two investigators did cite to the "Complainant's materially consistent statements to [among other entities] OIEC."[146] But no evidence exists that Roe ever made a statement *to* OIEC; at most, she made a statement to a CUPD officer in the presence of an OIEC staffer.

In the end, Colorado seemed to adopt an approach of borrowing information from the criminal investigation—though only in ways that enhanced the likelihood of a finding of responsibility. The substance of the OIEC report opened with nearly eight pages of verbatim quotes from the police reports' discussion of interviews with Roe. Several pages of verbatim quotes of police interviews with Messeri followed.

It remains unclear why CU's Title IX apparatus followed this approach. Perhaps it was because of the Title IX training they received, perhaps due to a personal bias. But, as with the interim punishment, it's at least plausible, and in all likelihood more than plausible, that CU officials relied on the police rather than telling Roe that the case couldn't move forward without at least some chance to speak with her partly due to fear of another Wilkerson case. With the Wilkerson victim having publicly lamented, in a highly emotional court statement, that she had to speak to both CU investigators and police, it perhaps is unsurprising that Colorado took the approach to the Messeri punishment that it did. After all, piggybacking on the police investigation in this fashion surely would avoid any possible in negative publicity.

As with the interim punishment, the Seventh Circuit's interpretation of Title IX's applicability to this type of issue holds just as strongly.

There were three additional areas in the intersection between the police investigation and Messeri's Title IX adjudication that raise concerns.

*First* (on three separate occasions) University officials made decisions that frustrated Messeri's efforts to defend himself.

(1) The OIEC "briefly delayed" notifying Messeri of the Title IX complaint, until university administrators were confident that doing so would not "interfere" with the criminal investigation.[147] But it's not OIEC's job to run interference for a criminal investigation, and any

---

[145] Confidential Final Draft Report, at 3, 4, CU/Messeri 305.
[146] *Id.* at 32.
[147] *Id.* at 2; Messeri, describing himself as "very scared," called the OIEC when he received the Notice of Investigation. Messeri/CU 529, Jessie, 9/14/2016, 9:56am.

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

delay in notification could have threatened Messeri's ability to gather exculpatory information necessary to defend himself from the Title IX allegations.

The notification, in the end, was delayed for around 36 hours.[148] Ironically, the CU Office for Victim Assistance has noted how "time sensitive" the first 72 hours after an incident can be.[149] The decision to withhold notice from Messeri robbed him of half of that period. And the training provided to CU personnel by Pepper Hamilton stressed the "importance of preserving evidence."[150] The non-disclosure of the investigation to Messeri threatened to hamper his ability to gather and preserve evidence.

(2) Then, on September 19, 2016, OIEC Investigator Jessie Polini[151] called Jessica Ladd-Webert, from Colorado's Office of Victim Assistance (OVA). Polini learned that Messeri had hired a lawyer, who was conducting his own investigation of the incident. (Given that Messeri was potentially facing a decade or more in prison if the criminal case went to trial and he was convicted, there was nothing unusual about this tactic.) Polini, however, asked Ladd-Webert to reach out to Roe, inform her that Messeri likely had hired a private investigator, that Roe wasn't "required" to speak with the investigator, and that if the investigator made "harassing attempts to speak with her," Messeri could be found responsible for a Title IX violation (failing to adhere to the no-contact order).[152] At the time that Polini made the phone call, Roe does not appear to have been contacted by any private investigator, much less in a harassing way.

| | | |
|---|---|---|
| 9/19/2016 5:16 PM | Jessie | Polini spoke to Ladd Webert, OVA, and updated her that Messeri had an attorney who was conducting his own investigation into the allegations and asked her to remind McIntyre that she was not required by the OIEC to speak with any PI's and that it could potentially violate the NC O if the PI made harassing attempts to speak with her. |

In effect, Polini was using the Title IX process to hamper Messeri's criminal defense. Her caution gave Messeri a choice—vigorously defending himself from criminal charges would likely yield a Title IX infraction that could lead to his expulsion.

---

[148] Polini to Messeri, Sept. 14, 2016, Messeri/CU 105.

[149] GET HELP: OVA RESOURCE LIBRARY, Messeri/CU 1976.

[150] Clery Requirements, Pepper Hamilton, Messeri/CU 1239.

[151] In 2010, Colorado hired Polini as a Title IX investigator even though she had no experience in either law enforcement or conducting investigations of felony-level offenses. She had received her J.D. the previous year, and then had worked as a lawyer at a local firm, where she specialized in "child support proceedings." Polini CV, CU Classified Staff Application, 2010, Messeri/CU 105. It's not clear if this was the type of background of which the CU Title IX apparatus spoke when it informed the Pepper Hamilton team in 2013 that it had "experienced investigators." TALKING POINTS FOR GINA MAISTO SMITH AND LESLIE GOMEZ, Sept. 25, 2013, Messeri/CU 1199.

[152] Jessie, 9/19/2016, 5:16pm, Messeri/CU 529

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

(3) Finally, on September 20, 2016, Polini met with the CUPD's Ellis von Rivenburgh, who said the department had the video recording of CUPD's interview with Roe, as well as an audio interview the police had done with Messeri. Again, CUPD the sole entity interviewing Roe; and at this point, no formal OIEC interview had occurred with Messeri.

Instead of immediately accepting this material, however, Polini expressed a caution. Messeri, she mentioned to von Rivenburg, had a lawyer. It was "possible"—he hadn't done so yet—that the lawyer would ask for the OIEC file, which OIEC would allow. That raised the possibility that Messeri's lawyer would get access to evidence from the criminal inquiry at a stage earlier than available to most defendants. Von Rivenburg, seemingly appreciative, suggested that he would turn over the key video evidence to OIEC only after he and his colleague "brought the situation to SART and determined how they were going to proceed."[153]

Obviously, the specifics of the Messeri investigation—with the critical witness, Roe, refusing to be interviewed by OIEC—were unusual. Yet here Polini, in effect, gave the CUPD a heads-up, with the effect of delaying OIEC getting access to critical evidence. She did so not to make things eager for the OIEC inquiry (not immediately possessing the video would delay things), and her action had no relationship to Roe's Title IX rights. Rather, the motive seems to have been to hamper Messeri's *criminal defense*. But that's not the job of Colorado's Title IX office. In the end, Messeri was never provided with any hard evidence of the investigation from OIEC or CUPD, such as videos or interview transcripts. Instead, he received only the CU Written Evidence Summary and the Final Report.

On each of these three occasions, the OIEC was effectively functioning as an arm of the police department, acting in ways that increased the chances of Messeri being charged, rather than determining whether he had committed a conduct violation under the university's Title IX policies.

This approach was all the more troubling given the terms of the OIEC/CUPD memorandum of understanding, in which CUPD committed itself to conducting a "victim-centered, offender-focused investigation."[154] Of course, a Title IX investigation doesn't presume the respondent is an offender or that the accuser is a "victim." The MOU offers no guidance on what a "victim-centered" investigation entailed, or how such an inquiry differed from an investigation whose sole goal is to determine the truth of what happened.

---

[153] Jessie, 9/20/2016, 10:19am, Messeri/CU 529.

[154] Memorandum of Understanding (OIEC and CUPD), n.d., Messeri/CU 1026.

*Second*, having functioned as a *de facto* arm of the police for the first five weeks of the investigation, OIEC decoupled from the police investigation just as the inquiry started showing signs of doubt about Roe's credibility.

On October 27, 2016, Officer von Rivenburg requested another meeting with Roe. This interview focused mostly on the inconsistencies in Roe's account, including its seemingly non-credible elements.

Von Rivenburg focused on the aspect of Roe's behavior that seemed wholly at odds with her claim of being assaulted—that, after the purported assault, she and W1 spent considerable time riding up and down the dorm elevator, stopping at each floor, rather than seeking to leave the dorm.[155] The elevator video, as von Rivenburg noted, showed her "smiling and appearing to be joking around with" W1.[156] Roe offered an odd explanation for her conduct: "It was humorous at the time because we are two random girls in a building and we have no idea where we are. So I guess we were just trying to make the best out of the situation."[157]

Von Rivenburg pressed, with a logical observation. "I explained to that anyone that may be familiar with an elevator or someone that is lost in a building will generally go to the first floor to try and leave. I asked to tell me about what was going through her mind at the time."[158] Roe had no response: she "stated she couldn't really tell me what was going through her mind at the time."[159] Later in the interview, even more strangely, Roe informed the officer that "the elevator is when she really told [W1] the details about what happened." According to Roe, then, W1—after hearing that her best friend had just been assaulted—spent time riding up and down an elevator, smiling and joking. The excerpt below features Roe's curious response to why she and her friend simply wouldn't have pressed the floor one button on the elevator.

An excerpt of the exchange can be found in the Report Video document.

The von Rivenburg interview also featured Roe offering a subtle shift in how alcohol affected her on the night of the incident. She explained that she "was drinking and was in a panic it may have affected her ability to get away." That same state, however, obviously could have affected her impressions of Messeri. Indeed, she told von Rivenburg a bit later that, during the incident,

---

[155] It appears as if Messeri only learned the identity of W1—arguably the most important witness in the case, given OIEC's reliance on her to corroborate Roe's version of events—during the (aborted) criminal proceedings against him.
[156] Messeri/CU, VONRIVERBURG-SUP 3, Von Rivenburg, University of Colorado Police Report Narrative, Oct. 31, 2016.
[157] *Id.*
[158] *Id.*
[159] *Id.*

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

Messeri asked her, "Do you like this? Like is this good?" She offered no further thoughts as to why Messeri would have been solicitous of her feelings.[160]

The von Rivenburg October 27 interview established a significant credibility problem for the complaining witness. The only relevant electronic evidence from the evening in question—the elevator video—showed the complainant enjoying herself, so eager to hang around in the dorm that she and her best friend were stopping the elevator at each floor and peering out. Nothing in the video corroborated Roe's claim that the video actually would show her telling her friend that she had been assaulted, or a figure lost and desperate to leave the dorm. No wonder the criminal charges against Messeri ultimately were dropped.

This same interview, however, did not seem to trouble OIEC at all. Rather than relying on the police account, OIEC produced its own summary of the interview, subtly shaded to make Roe seem more credible. For instance, the summary of the elevator testimony didn't include von Rivenburg's common-sense observation "that anyone that may be familiar with an elevator or someone that is lost in a building will generally go to the first floor to try and leave." It did, however, paraphrase (without any hint of skepticism) Roe's claim that by hitting each of the buttons on the elevator, while joking around, she and W1 were actually "attempting to get to the first floor."[161] The OIEC notes also claimed that Roe "scoffed" when von Rivenburg asked her whether she was at all upset when Messeri left the elevator (to go and chat, it appeared, with another female student).[162] Von Rivenburg's notes, by contrast, offered no such editorializing.

In short, it seems as if OIEC was willing to defer to the criminal justice system's handling of Roe's credibility as long as it seemed as if Messeri might be charged and found guilty—only to adopt differing conclusions as the police investigation started pressing Roe on her inconsistencies.

In the nearly 500 post-2011 cases in my database—and these, again, are cases derived from allegations of unfair conduct by the university—I'm not aware of even one in which the university: (a) relied so heavily on the criminal investigation to develop the evidence ultimately used for a finding of responsibility; (b) attempted to retard the accused's participation in the criminal process in ways that increased the likelihood he would face criminal charges; and (c) distanced itself from the criminal investigation as it became clear that law enforcement was starting to have doubts about the accuser.

---

[160] *Id.*

[161] Hasselbacher and Polini, October 27, 2016, Messeri/CU 405.

[162] *Id.*

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

**X. Cross-Examination & the Investigative Model**

Colorado uses an investigative model, without the opportunity for a hearing. This procedural approach is no longer, in my opinion, a generally accepted practice. The single investigator model, in my opinion, has been found unreliable in part because the model does not permit a student or finder of fact the opportunity to pose questions to witnesses to resolve factual and credibility issues. I base this opinion, in part, on the fact that multiple courts have noted that the single investigator model is incompatible with fair and equitable resolution of Title IX allegations. In effect, the single investigator model allows one person (or, as in this case, two people acting in concert) to function as investigator, judge, and jury, without any meaningful check on their conclusions.

In September 2018, the Sixth Circuit cited the University of Michigan's denying the accused student an opportunity for cross-examination as sufficient to raise doubts about the accuracy of the school's finding, as required under *Yusuf*'s erroneous outcome test. Michigan, like Colorado, used the "single investigator" model at the time. The court then detected plausible evidence of gender discrimination by citing the combination of federal pressure on the university to crack down on sexual assault and the appeals board's having "credited exclusively female testimony (from the complainant and her witnesses) and rejected all of the male testimony (from the accused student and his witnesses)."[163]

U.S. District Judge Arthur Tarnow observed that that "[w]ithout a live proceeding, the risk of an erroneous deprivation of [p]laintiff's interest in his reputation, education[] and employment is significant."[164] Judge Tarnow added that when a school only permits questioning through the investigator, a student "has no way of knowing which questions are actually being asked of [c]laimant or her response to those questions."[165]

Nor are these sentiments confined to the Sixth Circuit, or California—where the issue has appeared in multiple decisions.[166] U.S. District F. Dennis Saylor, in a case from Massachusetts, observed: "The dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach

---

[163] Doe v. Baum, 2018 U.S. App. LEXIS 25404, *22-23 (6th Cir. Sept. 7, 2018).
[164] Doe v. University of Michigan, 325 F. Supp. 3d 821 (E.D. Mich. 2018).
[165] *Id.*
[166] Doe v. Regents of the Univ. of Cal., 28 Cal. App. 5th 44, 61 (Cal. Ct. App. 2018); Doe v. Allee, 30 Cal. App. 5th 1036, 1068–1070 (Cal. Ct. App. 2019).

premature conclusions."[167] And U.S. District Keith Sterrett, evaluating a complaint filed by a student against the University of Southern Mississippi, praised the *Baum* court (even though it was not from his circuit) for doing "an excellent job of explaining the unique aspects of this type of case where credibility is at issue and the consequences are grave if a party is found 'responsible.'"[168] Judge Sterrett added, "The value of the additional safeguards is immense in a he said/she said situation. When credibility is at issue, it is crucial to be able to attempt to draw out the truth and should be required in circumstances like these because it is the greatest legal engine ever invented for uncovering the truth."[169]

This view is consistent with the actions of the Department of Education. In November 2018, the Department proposed a rule that would effectively eliminate the single investigator model championed by Professor Lake. Under the proposed rules, an investigator could still interview the students and witnesses, collect documentary or other types of evidence, compile a report, and perform all other investigation-related duties. However, the investigator would be prohibited from serving as the decision-maker or as part of a decision-making panel.[170]

Even Pepper Hamilton, CU's hired consultants after the OCR complaint, has conceded the obvious. A recent webinar conducted by Pepper Hamilton's Higher Education Practice Group, intended for "in-house counsel and school administrators," shows the emerging consensus.[171] "If you look at how the case law is evolving, it is moving away from the single investigator model," Group co-chair Michael Baughman observed.[172] Group co-chair Amy Foerster added, "If you're still using the single investigator model, consider whether the summer is the time to make a switch . . . Courts are moving in that direction, certain states have legislation that is moving in that direction, and now might be the time for you to do so as well."[173]

---

[167] Doe v. Brandeis University, 177 F. Supp. 3d 561 (D. Mass. 2016).
[168] Doe v. Univ. of So. Miss., No. 2:18-cv-00153 (S.D. Miss. Sept. 26, 2018).
[169] *Id.* (internal quotations omitted).
[170] OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION, Notice of Proposed Rulemaking, Docket ID ED-2018-OCR-0064 (Nov. 16, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.
[171] HIGHER EDUCATION 'IN BRIEF' SERIES- TITLE IX IN LIMBO: PRACTICAL STEPS FOR SUMMER 2019, June 18, 2019, https://www.jdsupra.com/legalnews/higher-education-in-brief-series-titl-66084/.
[172] TITLE IX IN LIMBO: PRACTICAL STEPS FOR SUMMER 2019, June 18, 2019, https://www.jdsupra.com/videoembed/?fid=3f8163b1-4bf4-4bbc-bad7-9f1e84c0cfe6 (at 16:13).
[173] *Id.* (at 17:32).

Department of History
Brooklyn College of The City University of New York
2900 Bedford Avenue • Brooklyn, New York 11210-2889 • Telephone (718) 951-5303 • Fax (718) 951-4504

Courts even have begun to explore the connection between cross-examination and Title IX itself. *Doe v. Marymount University* (2018) concluded that a policy biased against accused students "may well run afoul of Title IX" by "depriving students accused of sexual assault of the investigative and adjudicative tools necessary to clear their names even when there are no due process requirements."[174] *Doe v. Johnson and Wales University* (2018) could "find no reason at all as to why . . . the result was Mr. Doe's expulsion. The only inference that one could draw from that considering all the facts is that gender played a role."[175] And *Doe v. Rhodes College* (2019) suggested there could be a linkage between Title IX and "due process principles," even for students at private institutions.[176]

**XI. Relevance of Unfair Procedures**

Over the past eight years, there certainly have been Title IX cases in which the accused party or parties were obviously responsible, regardless of the unfairness of the university's procedures. In a classic example, video and photographic evidence showed that two University of Houston students had sexually assaulted an incapacitated female student.[177]

Messeri's, obviously, is not one of those cases. The available video evidence—from the dorm elevator—weakened Roe's credibility, and thus helped his case. Instead, Messeri's was a credibility case, involving five critical witnesses: the two parties, a female non-CU student (W1), and two male CU students (W2 and W3). Without the benefit of a hearing (and without its employees ever personally interviewing Roe), OIEC determined that the two female non-CU students were more credible than the three male CU students.

To the extent that three key contemporaneous witnesses had biases, their preexisting relationships worked in *Messeri*'s favor. W1 had a longstanding relationship with Roe, who she described as her best friend. On the other hand, W2 and W3 had only met Messeri a few weeks before. W2 and W3 would have had little or no possible reason to lie on behalf of someone

---

[174] Doe v. Marymount Univ., at 584 n.17 (E.D. Va. 2018). The proposed new Title IX regulations explicitly note that a "recipient's treatment of the respondent may also constitute discrimination on the basis of sex under title IX." OFFICE FOR CIVIL RIGHTS, DEPARTMENT OF EDUCATION, Notice of Proposed Rulemaking, Docket ID ED-2018-OCR-0064 (Nov. 16, 2018), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf, at 135.
[175] *Id*. at 40.
[176] Doe v. Rhodes College, Case No. 2:19-cv-02336 (W.D. Tenn., June 14, 2019).
[177] Plummer v. Univ. of Houston, 860 F.3d 767 (5th Cir. 2017).

they barely knew. By contrast, Roe's best friend might have—perhaps only subconsciously—recalled events to bolster her longtime friend's version.

Given Roe's significant credibility problems and given the critical ways in which W2 and W3 corroborated Messeri's version of events, it's likely that a fair process would have found Messeri innocent. Beyond the evidence already discussed—especially the contradictions between the video evidence of Roe and W1 on the elevator and what Roe suggested occurred on the elevator—consider how cross-examination would have allowed Messeri to address a critical aspect of the evidence: Roe's intoxication level.

| Time | Version |
|---|---|
| Roe, interview 1 | "kind of drunk" |
| Roe, interview 2 | Very drunk ("three quarters of a bottle of wine" plus marijuana), but after the incident |
| Roe, interview 3 | 4-5 on a 10-point scale of intoxication |
| Roe, interview 4 | Previously unmentioned episode of Messeri "egging her on to drink more alcohol" |
| W1 | Not at all intoxicated (couple of beers and wine spritzer) |
| W2 (OIEC, never told to the police) | Messeri pressuring Roe to drink |

Numerous other contradictions in Roe's story existed (whether she tried to scream, whether she couldn't leave the dorm because the car keys were left in Messeri's room). Because Colorado refused to give Messeri a hearing, he never had an opportunity to explore these inconsistencies, and what they might have meant to Roe's credibility.

Additionally, a hearing might have fortified the credibility of W2—the male student whose statement both corroborated Messeri's and challenged the credibility of both Roe and especially W1. W2 maintained:

- He never heard Messeri urge Roe to drink more;
- Messeri and Roe "seemed to be mutually feeling each other";
- Messeri and Roe left the room (to the bathroom where the incident occurred) holding hands, and he noticed no signs of force;
- He never heard any screaming from Roe in the bathroom;
- He smoked marijuana with Roe and W1 after the incident, and saw no signs of distress from Roe;
- He had no memory of retrieving W1's keys;
- Messeri was "trying to ditch" Roe after they had sex, to pursue another female student, and Roe seemed upset by this;

- He encountered Roe and W1 a few minutes later, and told them they needed to leave the dorm.[178]

W2 had only known Messeri a few weeks; he had no obvious motive to shade the truth. OIEC's report summarized W2's testimony but dismissed his credibility largely by citing the investigators' disbelief that Roe wasn't upset when Messeri left the elevator. But if W2 was credible, it's inconceivable that Messeri could have been found responsible.[179]

Perhaps, under cross-examination, W2 would have withered. But perhaps he would have held firm to his version of events. These are just the sorts of factual disputes for which a hearing with cross-examination would have been suitable to resolve. As the Sixth Circuit has pointed out, in the campus Title IX process, "Reaching the truth through fair procedures is an interest [an accused student] and [his university] have in common.[180] In this case, CU officials appeared to believe otherwise.

**Conclusion**

In my opinion, and in comparison to the almost 500 other lawsuits filed by accused students nationwide since the policy change associated with the 2011 Dear Colleague letter, Colorado approached the Messeri adjudication in a fundamentally unfair fashion. The university's procedures denied Messeri a meaningful chance to defend himself by denying him a hearing and preventing him (or a representative) from cross-examining Roe and W1. The imposition of the OIEC interim punishment contradicted the OCR's recommendations from Wesley College and raised concerns of gender bias. And the atmosphere that existed on campus—due both to the aftermath of the Biden visit and the controversy over the Wilkerson sentencing—was not conducive to a fair adjudication, instead imposing extraordinary pressure on the university to return a punitive finding against accused males.

---

[178] Telephone Interview with W2, September 21, 2016, Messeri/CU 416.

[179] Cross-examining W2 also might have brought greater information about a curious claim in the Final Report, in which the investigators asserted that "the OIEC finds Complainant credible in her statement that at the time of the elevator ride, she was 'in shock' and may have laughed with W2." W2's statement provided no mention of this laughing incident. Draft of Confidential Final Report, Nov. 8, 2016, at 36, CU/Messeri 340. Roe, moreover, gave a quite different explanation of the elevator video to CUPD, saying it occurred with W1, and, "It was humorous at the time because we are two random girls in a building and we have no idea where we are. So I guess we were just trying to make the best out of the situation." Messeri/CU, VONRIVERBURG-SUP 3, Von Rivenburg, University of Colorado Police Report Narrative, Oct. 31, 2016.

[180] Doe v. Univ. of Cincinnati, 872 F.3d 393, 402 (6th Cir. 2017).

Respectfully submitted,

KC Johnson

KC Johnson
Professor of History