**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 18-cv-2658-WJM-SKC

GIROLAMO FRANCESCO MESSERI,

      Plaintiff,

v.

PHILIP P. DISTEFANO, in his official capacity as Chancellor of the University of
Colorado, Boulder

      Defendant.

---

**ORDER GRANTING IN PART AND DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Girolamo Messeri was expelled from the University of Colorado at

Boulder (the "University") in November 2016 after the University concluded that he had

non-consensual sexual contact with a woman, identified only as Jane Doe.  (¶¶ 119,

132.)[1]  Plaintiff sues Chancellor Philip DiStefano in his official capacity, asserting

various theories about how the University violated Plaintiff's procedural and substantive

due process rights.  (ECF No. 12 at 32–62)  Plaintiff seeks damages and injunctive

relief, including a Court order that the University remove any record of Plaintiff's

expulsion from his education file or transcript.  (*Id.* at 62–64.)

Currently before the Court is the University's Motion for Summary Judgment

("Motion"), filed on October 30, 2019.  (ECF No. 68.)  For the reasons explained below,

the Motion is granted in part and denied in part.

---

    [1]  Citations to paragraph numbers, without more, e.g. (¶__), are to paragraphs in
Plaintiff's First Amended Complaint and Jury Demand.  (ECF No. 12.)

## I.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. PROCEDURAL MATTERS

The undersigned's Revised Practice Standards impose the following requirement on a summary judgment movant:

> All motions for summary judgment . . . must contain a section entitled "Movant's Statement of Material Facts."  This Statement shall set forth in simple, declarative sentences, all of which are separately numbered and paragraphed, each material fact the movant believes supports movant's claim that movant is entitled to judgment as a matter of law. Each

> statement of fact must be accompanied by a specific
> reference to supporting evidence in the record.

WJM Revised Practice Standard III.E.3.  The Revised Practice Standards further clarify

the following:

> The opposing party may not deny an assertion for lack of
> knowledge, unless (i) in response to an Early Partial Motion
> for Summary Judgment and such denial is made in good
> faith, or (ii) the party states within the body of its response a
> well-grounded request for additional discovery under Fed. R.
> Civ. P. 56(d) and attaches the affidavit or declaration
> required by that Rule.

WJM Revised Practice Standard III.E.4.d.  In response to numerous statements of fact,

Plaintiff states that he is "without sufficient knowledge to know if [that paragraph] is

accurate" without providing any well-grounded requests for additional discovery.  (*See

e.g.*, ECF No. 83, ¶ 5.)  Accordingly, the facts that Plaintiff neither admits nor denies are

deemed to be admitted.

## III. BACKGROUND

### A.    Factual Allegations[2]

On September 12, 2016, Jane Doe reported to the University of Colorado Police

Department ("CUPD") that Plaintiff had forced her to perform oral sex on him over the

weekend in his residence hall.  (ECF No. 68 at ¶ 1.)  On the same day, CUPD notified

the University's Office of Equity and Compliance ("OIEC") of Jane Doe's report.  (*Id.* at

¶ 2.)

---

[2]  The following factual summary is based on the parties' briefs on the Motion and
documents submitted in support thereof.  These facts are undisputed unless attributed to a
party or source.  All citations to docketed materials are to the page number in the CM/ECF
header, which sometimes differs from a document's internal pagination.

1.    <u>OIEC's Investigation</u>

Two OIEC investigators, Jessica Polini and Lauren Hasselbacher, were assigned to investigate whether Plaintiff's alleged conduct violated University policy.  (*Id.* at ¶ 3.) Hasselbacher and Polini sent Plaintiff a Notice of Investigation that informed him of the allegations, which, if proven, could constitute a violation of the 2016–2017 OIEC Process and Procedures.  (*Id.* at ¶ 4; ECF No. 68-1 at 1.)

Thereafter, Polini and Hasselbacher conducted the following steps to investigate Jane Doe's allegations:

- they reviewed an audio recording of Jane Doe's initial September 12, 2016 interview with CUPD (ECF No. 68 at ¶ 5; ECF No. 69 at 3);

- they observed two subsequent CUPD interviews of Jane Doe on September 19, 2016 and October 27, 2016 (ECF No. 68 at ¶ 5; ECF No. 69 at 3);

- they reviewed an audio recording of Plaintiff's interview with CUPD (ECF No. 68 at ¶ 9; ECF No. 69 at 4);

- they met with Plaintiff to discuss the investigative process on September 29, 2016 (ECF No. 68 at ¶ 12; ECF No. 69 at 3);

- they interviewed six witnesses, including witnesses suggested by both Jane Doe and Plaintiff (ECF No. 68 at ¶ 14; ECF No. 69 at 2);

- they reviewed text messages, video surveillance footage from the University residence hall, CUPD reports, and an interview conducted by Plaintiff's private investigator (ECF No. 68 at ¶ 17; ECF No. 69 at 2).

Although Polini and Hasselbacher provided Plaintiff an opportunity to speak with them, they did not actually speak to Plaintiff about Jane Doe's allegations, (ECF No. 68 at ¶ 10; ECF No. 69 at 3), nor did they conduct an independent interview of Jane Doe. According to Polini and Hasselbacher, they were "able to obtain all relevant information during the[] interviews between [Jane Doe] and CUPD."  (ECF No. 68 at ¶ 8; ECF No. 69 at 3.)

After completing their investigation, Polini and Hasselbacher prepared a Written Evidence Summary ("WES"), which they provided to Plaintiff and Jane Doe on October 18, 2016.  (ECF No. 68 at ¶ 18; ECF No. 69 at 3.)  Plaintiff provided a written response to the WES, pointing out inconsistencies in the witnesses' accounts.  (ECF No. 68 at ¶¶ 20–21; ECF No. 69-1.)  His attorney also provided a written response to the WES. (ECF No. 68 at ¶ 22; ECF No. 69-2.)

Applying a preponderance of the evidence standard, Polini and Hasselbacher issued a Final Investigation Report, which concluded that it was more likely than not that Plaintiff forced Jane Doe into non-consensual sexual activity and concluded that Plaintiff's conduct violated provision G2(a) (Sexual Assault – Nonconsensual Sexual Intercourse) of the OIEC Process and Procedures.  (ECF No. 68 at ¶ 25; ECF No. 69 at 38.)

2.    Standing Committee Review

On November 8, 2016, the OIEC's Standing Review Committee reviewed the Final Investigation Report prepared by Polini and Hasselbacher.  (ECF No. 68 at ¶ 27–29; ECF No. 68-5.)  According to the Standing Committee Members, in addition to being given the Final Investigative Report, they were given access to the full

investigative file and reviewed the findings for investigator bias, thoroughness, and sufficiency.  (ECF No. 68 at ¶¶ 28–29; ECF No. 69-6 at ¶ 7–9; ECF No. 69-7 at ¶¶ 4–6; ECF No. 69-8 at ¶¶ 4–6.)  Thereafter, the Standing Review Committee Members signed a statement agreeing that the "investigation was conducted in a fair and unbiased manner and that the conclusion is reasonable."  (ECF No. 68 at ¶ 31; ECF No. 69-5.)

       3.    <u>Notice of Filings and Sanction</u>

On November 8, 2016, Plaintiff was sent a written Notice of Finding ("Notice of Finding") informing him that he has been found responsible for engaging in "Sexual Assault - Non-Consensual Intercourse" in violation of the 2016–2017 OIEC Process and Procedures.  (ECF No. 68 at ¶ 32; ECF No. 69-9 at 1.)  In explaining the "[n]ext [s]teps," the Notice of Finding informed Plaintiff that the Title IX Coordinator and Executive Director for the OIEC would determine his sanction.  (ECF No. 69-9 at 1.)

Plaintiff, his father, his attorney, and an Italian consul met with OIEC Executive Director Valerie Simons to discuss the sanction.  (ECF No. 68 at ¶ 32.)  Thereafter, on November 23, 2016, Simons sent Plaintiff a Notice of Sanction informing him that he was being "permanently expelled from the University" and was "excluded from all University" campuses.  (ECF No. 69-11 at 1; ECF No. 68 at ¶ 35.)

The University states that its Process and Procedures allowed Plaintiff to request a Director's review, but it admits that the Notice of Sanction did not notify Plaintiff that the Director could reopen cases if new information became available, if the OIEC Procedures were not followed, or if additional circumstances warranted.  (ECF No. 68 at ¶ 36; ECF No. 69-12; ECF No. 83-3 at ¶ 133.)

6

## III. ANALYSIS

**A.      Legal Standard for Procedural Due Process**

The Fourteenth Amendment's Due Process Clause, states, "No state shall . . .

deprive any person of life, liberty, or property without due process of law."  U.S. Const.

amend. XIV, § 1.  A court must "examine procedural due process questions in two

steps: the first asks whether there exists a liberty or property interest which has been

interfered with by the State; the second examines whether the procedures attendant

upon that deprivation were constitutionally sufficient."  *Ky. Dep't of Corr. v. Thompson*,

490 U.S. 454, 460 (1989) (internal citation omitted); *see also Zwygart v. Bd. of Cnty.*

*Comm'rs*, 483 F.3d 1086, 1093 (10th Cir. 2007).[3]

"[D]ue process is flexible and calls for such procedural protections as the

particular situation demands."  *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)

(alterations in original).  To determine the procedural protections demanded by any

particular situation, a court must consider three factors: (1) the interests of the individual

in retaining their property and the injury threatened by the official action; (2) the risk of

error through the procedures used and the probable value, if any, of additional or

substitute procedural safeguards; and (3) the costs and administrative burden of the

additional process, and the interest of the government in efficient adjudication.  *See id.*

at 335.

---

[3]  Plaintiff may sue the University for a Fourteenth Amendment violation because it is an
arm of the State of Colorado. *See* Colo. Const. art. VIII, §§ 1, 5.

**B.    Procedural Due Process**

The parties agree, for purposes of this Motion, that Plaintiff has liberty and property interests with which the University has interfered.  (ECF No. 68 at 7; ECF No. 83 at 14–16.)  At present, their disputes relate to whether the University's procedures and conduct violated his constitutional right to procedural due process.  The Court's analysis relating to whether Plaintiff received adequate procedural due process applies with equal force to Plaintiff's Count I (property interest) and Count IV ("Stigma Plus"). (¶¶ 137–175, 220–258.)

1.    Right to a Hearing

When it comes to due process, the "opportunity to be heard" is the constitutional minimum.  *See Grannis v. Ordean*, 234 U.S. 385, 394 (1914). But determining what being "heard" looks like in each particular case is a harder question.  *See Goss v. Lopez*, 419 U.S. 565, 577 (1975) ("Once it is determined that due process applies, the question remains what process is due.").

Plaintiff contends that the University deprived him procedural due process by "providing no form of hearing, even though credibility determinations were required." (¶¶ 165(v), 248(iv).)  He argues that he has the right "to a complete and impartial investigation, with evidence evaluated by a neutral and detached decision maker following a live hearing."  (ECF No. 83 at 20.)  The University, however, argues that due process was satisfied because "Plaintiff had plenty of chances to 'answer, explain, and defend'" himself.  (ECF No. 68 at 10.)  In particular, the University points to the fact that Plaintiff was afforded an opportunity to respond to the factual allegations against him

and provide information to the investigators throughout the course of the investigation. (*See id.* at 9–10.)

Applying the *Mathews* balancing test, the Court recognizes that Plaintiff has a strong interest in completing his education and avoiding mistaken expulsion from the University.  *See Goss*, 419 U.S. at 579 ("The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences."); *Siblerud v. Colo. State Bd. of Agric.*, 896 F. Supp. 1506, 1516 (D. Colo. 1995) ("[Plaintiff] faced expulsion; therefore, his private interest was exceptionally robust.").

Requiring a hearing before a neutral arbitrator would also reduce the risk of error.  Here, Polini and Hasselbacher both investigated Plaintiff's case and determined that Plaintiff was responsible for violating the OIEC Process and Procedures.  A neutral decisionmaker would provide a fresh perspective on any credibility determinations and decrease the likelihood that a party would be erroneously found responsible.  While such a requirement may increase the University's costs and administrative burden, the University does not contend, nor, in the Court's view, could it reasonably contend, that such costs outweigh Plaintiff's interest in avoiding being mistakenly expelled from the University and allowing him to more fully defend himself.

A reasonable factfinder could thus find that the University's failure to provide Plaintiff a hearing before a neutral arbitrator violated his procedural due process. Accordingly, the Court denies this aspect of the University's Motion for Summary Judgment.

2.      Right to Cross-Examination

Plaintiff alleges that the University violated his procedural due process by "providing no method through which Plaintiff could ask questions of witnesses or cross-examine Jane Doe." (¶¶ 165(vi), 248 (v).)

The University has moved for summary judgment regarding this alleged due process violation, arguing that *Mathews* does not require more due process than was provided. (ECF No. 68 at 12.) In particular, it argues that by allowing Plaintiff to respond to the WES, Plaintiff was provided an opportunity to "test[ ] Jane Doe's and W1's credibility by identifying what he considered to be 'inconsistencies.'" (*Id.* at 11.) According to the University, "[t]he investigators reviewed Plaintiff's questions and determined that Jane Doe had already answered each question during her interviews." (*Id.*)

Plaintiff argues that the OIEC Policies and Procedures neither automatically allow for an accused to submit questions to be asked of witnesses nor require that complainants hear or answer the questions. (ECF No. 83 at 23.) Plaintiff also argues that he would have had more questions if he had full access to the full investigative file, including the videos of Jane Doe on the elevator after their encounter.[4] (*Id.* at 24.) Because his case largely depends on credibility determinations, he contends that he

_____

[4] Plaintiff represents that he did not receive the elevator videos until he received his criminal case discovery in June 2018, more than a year and a half after he was required to submit his questions to the University. (ECF No. 83 at 24.) His written response to the WES, however, implies that he had seen the elevator video before submitting his response to the WES. (ECF No. 69-1 at 2 (stating that certain statements made by Jane Doe "DO[ ] NOT MATCH with the video of the elevator"); ECF No. 69-2 at 3.)

should have been provided a meaningful opportunity to cross-examine the witnesses testifying against him.  (*Id.* at 26–27.)  The Court agrees.

The Supreme Court has stated that "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested."  *Davis v. Alexa*, 415 U.S. 308, 316 (1974).  Within the context of student disciplinary proceedings where witness credibility is at issue, an increasing number of courts have recognized that the Due Process Clause requires some form of cross-examination. *See, e.g.*, *Doe v. Baum*, 903 F.3d 575, 583 (6th Cir. 2018) (holding that, for sexual misconduct disciplinary proceedings, due process requires "some form of *live* questioning *in front of* the fact-finder" (emphasis in original)); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019) ("[W]e agree . . .  that due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel.'"); *Winneck v. Manning*, 460 F.2d 545, 550 (2d Cir. 1972) ("[I]f this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing.").

As examined above in Part III.B.1, Plaintiff has a substantial interest in avoiding expulsion and continuing his education.  The University's interests in limiting procedural safeguards relating to student's hearing rights are less evident.  Although the University correctly points out that it has an interest in avoiding "convert[ing] its classrooms to courtrooms" to referee cross-examination amongst students and their representatives

(ECF 68 at 12), this interest truly pales in comparison to the risk of error which may result in the wrongful expulsion of a student.

This is a classic "he said, she said" case that turns almost entirely on witness credibility.  Without live adversarial questioning, Plaintiff cannot probe the witnesses' stories to test their memories or potential ulterior motives, or to observe the witnesses' demeanor.[5]  *See Baum*, 903 F.3d at 581 (recognizing that "written statements cannot substitute for cross-examination"); *Lee v. Univ. of New Mexico*, — F. Supp. 3d —, 2020 WL 1515381, at *35 (D.N.M. Mar. 30, 2020) (recognizing plaintiff was deprived of a meaningful opportunity to be heard where his university did not allow for any cross-examination).  A reasonable factfinder could find that the risk of erroneous deprivation outweighs the University's interests and violates Plaintiff's procedural due process.[6]

Accordingly, the Court will deny the University's request for summary judgment as to this theory of procedural due process.

---

[5]  The University argues that it does not have the power to compel witness participation or require that a witness answer questions presented.  (ECF No. 86 at 11.) That well may be true; it does not mean, however, that the University should not allow for cross-examination during a hearing.  Moreover, to the extent a witness refuses to participate in a hearing, that fact may be relevant to the decisionmaker's credibility determinations in some cases.

[6]  This does not mean that Plaintiff has a right to *personally* confront his accuser.  After all, "[u]niversities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment."  *Baum*, 903 F.3d at 583.  "But in circumstances like these, the answer is not to deny cross-examination altogether."  *Id.* (recognizing that the benefits of cross-examination could be achieved without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker by allowing the accused student's agent to conduct cross-examination on his behalf); *Maryland v. Craig*, 497 U.S. 836, 857 (1990) (holding that where forcing the alleged victim to testify in the physical presence of the defendant may result in trauma, the court could use an alternative procedure that "ensures the reliability of the evidence by subjecting it to rigorous adversarial testing" through "full cross-examination" and ensuring that the alleged victim could be "observed by the judge, jury, and defendant as they testified").

3.     OIEC's Failure to Conduct Independent Interviews of Jane Doe

Plaintiff contends the University violated his procedural due process rights by "failing to conduct independent, OIEC interviews of Jane Doe." (¶¶ 165(ii), 248(i).) The University has moved for summary judgment on this theory of due process violation, pointing out that OIEC investigators already listened to Jane Doe's three interviews with CUPD and attended two of the interviews. (ECF No. 68 at 13.) It argues that Plaintiff has failed to establish the probable value, if any, of requiring the University to interview Jane Doe. (*See id.* at 13–14.) The Court agrees.

In his response, Plaintiff focuses on inconsistencies that he believes that CUPD officers should have explored during their interviews of Jane Doe. (ECF No. 83 at 27–30.) He does not, however, provide any evidence suggesting that an interview by the OIEC investigators would yield any different results. Nor does he make any suggestion that Jane Doe's recollection of her sexual encounter with Plaintiff varied across the three interviews. Accordingly, Court finds that Plaintiff has not provided any evidence from which a reasonable factfinder could conclude that the OIEC's failure to conduct an independent interview of Jane Doe violated his procedural due process.[7] The Court accordingly will grant summary judgment as to this theory of procedural due process in favor of the University.

---

[7] The Court observes that Plaintiff's arguments that Jane Doe should have been questioned about certain perceived inconsistencies are, in essence, arguments in favor of his right to cross-examine witnesses.

4.    <u>Preponderance of the Evidence Standard</u>

Plaintiff alleges that the University failed to provide due process by "applying the preponderance of the evidence standard - rather than a clear and convincing evidence standard." (¶¶ 165(iv), 165(vii), 248(iii).)

A "clear and convincing" evidentiary standard is required "when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than a mere loss of money.'" *Santosky v. Kramer*, 455 U.S. 745, 756 (1982) (quoting *Addington v. Texas*, 441 U.S. 418, 424 (1979)). The Supreme Court has determined that certain types of proceedings require a "clear and convincing" standard of proof. *See, e.g.*, *Woodby v. INS*, 385 U.S. 276, 286 (1966) (deportation hearings); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974) (defamation involving a public figure); *Santosky,* 455 U.S. at 769 (parental rights termination); *Cruzan v. Director, Mo. Dep't of Health*, 497 U.S. 261, 284 (1990) (withdrawal of life support). Recognizing that the "clear and convincing" standard is "typically used in civil cases 'involving allegations of fraud or some other quasi-criminal wrongdoing,'" *Century Sur. Co. v. Shayona Inv., LLC*, 840 F.3d 1175, 1177 (10th Cir. 2016) (quoting *Addington*, 441 U.S. at 424), the Tenth Circuit has also required the heightened evidentiary standard in cases involving civil contempt liability*, F.T.C. v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004), or a motion under Federal Rule of Civil Procedure 60(b)(3), *Anderson v. Dep't of Health and Human Servs.*, 907 F.2d 936, 952 (10th Cir. 1990).

Thus far, it appears that no federal court has concluded that students accused of sexual assault are entitled to a standard of proof requiring "clear and convincing"

evidence in disciplinary proceedings.[8]  *See, e.g.*, *Lee*, 2020 WL 1515381, at *38 ("While a few federal courts have addressed this issue, none have concluded that students accused of sexual assault are entitled to a higher standard of proof in disciplinary proceedings."); *Doe v. Va. Polytechnic Inst. & State Univ.*, 400 F. Supp. 3d 479, 501 (W.D. Va. 2019) (rejecting need for heightened evidentiary standard); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) (concluding preponderance of the evidence standard for sexual assault disciplinary proceedings "is not problematic, standing alone"); *Doe v. Univ. of Ark.-Fayetteville*, 2019 WL 1493701, at *10 (W.D. Ark. Apr. 3, 2019) ("Doe fails to argue how the preponderance of the evidence standard, utilized in similar sexual misconduct civil actions, denies due process.").

To evaluate the evidentiary burden of proof required in Plaintiff's disciplinary proceeding, the Court weighs the three *Mathews* factors.  As discussed above, Plaintiff's private liberty interests and his risk of erroneous deprivation are substantial. Increasing the evidentiary standard would undoubtedly make it less likely that the University erroneously sanctioned Plaintiff or others similarly situated.  The Court finds, however, that the University's interest in a lower standard of proof is also strong, and ultimately outweighs Plaintiff's interests.  If the University were required to utilize a clear and convincing evidentiary standard—which is higher than the standard used in other civil actions—it would have to expend more resources to investigate and adjudicate

---

[8]  In his response, Plaintiff cites a September 20, 2018 order in *Lee v. Univ. of N.M.,* in which Judge Browning concluded "that preponderance of the evidence is not the proper standard for disciplinary investigations such as the one that led to Lee's expulsion."  (ECF No. 83 at 30 (citing *Lee v. Univ. of N.M.*, Case No. 17-cv-4569 (D.N.M. Sept. 20, 2018) (ECF No. 36 at 3).)  Notably, however, that sentence was removed in an amended order filed on May 30, 2019.  *See Lee*, 2020 WL 1515381, at *18.

cases, which would detract from other administrative priorities.  Moreover, requiring a higher evidentiary standard would make it more likely that the University reaches false negatives, *i.e.*, instances in which a culpable party is not sanctioned.  Such a result would detract from the University's "strong interest in the 'educational process,' including maintaining a safe learning environment for all its students."  *Plummer v. Univ. of Houston*, 860 F.3d 767, 773 (5th Cir. 2017) (quoting *Goss*, 519 U.S. at 583); *see also Gorman v. Univ. of R.I.*, 837 F.2d 7, 14 (1st Cir. 1988) ("Although the protection of [a student's private interest] would require all possible safeguards, it must be balanced against the need to promote and protect the primary function of institutions that exist to provide education.").

Balancing these interests, the Court concludes that it is beyond dispute that due process currently permits state educational institutions to adjudicate disciplinary proceedings relating to sexual misconduct using a preponderance of the evidence standard.[9]  Accordingly, the Court grants summary judgment in favor of the University as to this theory of procedural due process.

_____

[9]  To the extent Plaintiff claims that the University (1) "misappl[ied] the preponderance of the evidence standard and [found] Plaintiff responsible despite a lack of evidence weighing in favor of Jane Doe" (¶¶ 165(vii), 248(iii)), or (2) improperly shifted the burden of proof to Plaintiff to prove that he was innocent (¶¶ 101–02), the Court grants summary judgment in favor of the University.  Reaching the wrong result does not mean an individual's due process rights were violated because "due process does not require that any particular result from [university disciplinary] proceedings."  *Va. Polytechnic Inst. & State Univ.*, 2019 WL 3848794, at *16.  Likewise, the argument that the University improperly shifted the burden to Plaintiff to prove his innocence is actually an argument about the "locus of the burden of persuasion," which does not implicate due process concerns here.  *See Lavine v. Milne*, 424 U.S. 577, 585 (1976) ("Outside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment.").

5.      Withholding of W1's Identity

Plaintiff alleges that the University withheld W1's name from Plaintiff throughout the course of the OIEC investigation.  (¶¶ 113 n.9, 165(ix), 248(viii).)  He alleges that when he asked about W1's identity, he was informed that "any relevant witness would be in [the WES].[10]  (ECF No. 83 at 30.)  The WES did not, however, provide the name of W1, which deprived Plaintiff of the opportunity to have his private investigator interview W1.  (*See id.*)

The University has moved for summary judgment as to this theory of procedural due process violation, arguing that "the Due Process Clause does not guarantee that parties to an adversarial proceeding may discover every piece of evidence they desire." (ECF No. 68 at 15–16 (citing *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 520 (10th Cir. 1998)).)

The University cites *Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987) for the proposition that courts have not required "students facing a hearing on charges of misconduct be given the names of witnesses against them."  *Id.* at 662–63.  The Eleventh Circuit, however, clarified that it "did not require . . . that students facing a hearing on charges of misconduct be given the names of witnesses against them and a summary of their expected testimony, *when the opposing witnesses will testify in the presence of the accused.*"  *Id.* (emphasis added.)[11]

---

[10]  The University also alleges that Plaintiff could have reviewed the witness list at the OIEC office once the WES is issued.  (ECF No. 68 at ¶ 13.)  Plaintiff disputes this fact.  (ECF No. 83 at 30 ("The Written Evidence Summary did not provide the name of W1.").

[11] *Flaim v. Medical College of Ohio*, 418 F.3d 629, 639 (6th Cir. 2005)—which Plaintiff cites for the proposition that the accused is not required to receive a "comprehensive listing of evidence, witnesses, and copies of all documents intended to be produced"—is similarly

Where, as here, the opposing witnesses did *not* testify in the presence of the accused, the Court finds that a reasonable factfinder could determine that the University's decision to withhold W1's identify violated Plaintiff's procedural due process rights.  By being denied W1's identity, Plaintiff was effectively deprived of an opportunity to discover any inconsistencies in that witness's account that were not plainly evident from the WES.  Disclosure of key witnesses' names provides a minimal burden on the University.  The probative value of the information and risk of erroneous deprivation, however, is potentially substantial.  The Court will therefore deny the University's Motion for Summary Judgment as to this theory of procedural due process violation.

6.    Standing Review Committee Process

Plaintiff argues that Standing Review Committee review was a "sham process" and "rubber stamp." (¶¶ 122, 165(xiv), 248(xiii).)  He argues that the fact that the Standing Review committee received the Final Investigative Report and approved it on the same day suggests that there was not "a full and proper review of the evidence, procedures or credibility determinations."  (ECF No. 83 at 31.)  The University has moved for summary judgment on this theory of procedural due process. (ECF No. 68 at 17.)

In light of Plaintiff's personal interest in the proceedings and the University's competing interest in efficient adjudication, determination about whether Plaintiff's

---

distinguishable from the present scenario.  At the time of the hearing in *Flaim*, the accused had already pled guilty in his corresponding criminal case.  *See id.* at 639.  Because the factual allegations and the accused's guilt was uncontroverted, the probable value from the extra evidence was minimal.  This is a wholly different situation from the present case, in which the facts and Plaintiff's culpability were in dispute at the time he requested W1's identity.

procedural rights were violated turns on "the risk of erroneous deprivation . . . through the procedures used, and the probable value, if any, of additional procedural safeguards." *Mathews*, 424 U.S. at 321.  According to the University, "[b]ecause more time would not have made a difference to the Standing Review Committee, due process does not require anything lengthier." (*Id.* at 18.)  The Court agrees.

Plaintiff fails to provide any evidence that the Standing Committee Members did not review the Final Investigative Report or the evidentiary file.  Nor does he provide any factual basis from which a reasonable factfinder could conclude that the Standing Committee Members would have reached a different conclusion if they were required to spend additional time reviewing the investigative file.[12]  Plaintiff's conjecture regarding the Standing Committee Members' review is insufficient to state a *prima facie* claim for a procedural due process violation.[13]  The University is therefore granted summary judgment as to this theory of procedural due process.

    7.    <u>Right to Appeal</u>

Plaintiff contends his procedural due process rights were violated because he was denied "a right to appeal both the finding and the sanction, even though he would

---

[12]  Plaintiff also argues that it is "hard to find that the Standing Review Committee did more than rubber stamp the [Final Investigative Report]" in light of the "incomplete investigation, difference in credibility assessment, failure to address elevator videos, failure to address inconsistencies, and other issues." (*Id.*)  This argument, however, is little more than a renewed attempt to challenge the substance of the Standing Review Committee's decision.  Plaintiff's substantive due process claims based on the investigation and Standing Review Committee review have already been dismissed with prejudice.  (ECF No. 59 at 22–23.)

[13]  Moreover, to the extent Plaintiff argues that the Standing Review Committee members "lack adequate training" (¶ 87; ECF No. 83 at 32), the Court grants summary judgment in favor of the University.  Despite making conclusory statements regarding their training, Plaintiff does not provide any actual evidence from which a reasonable factfinder could determine that Plaintiff's procedural due process was violated.

have had a right to appeal, or to seek leave to appeal through an appeal committee, under the Student Conduct Code."  (¶¶ 165(xv), 248(xiv).)

The OIEC Policies and Procedures state that "the Executive Director or designee has the discretion to re-open an investigation in limited circumstances."  (ECF No. 68-12 at 16.)  Section C(5) provides that

> [t]he OIEC Executive Director or designee has the authority and discretion to review and take any appropriate action deemed necessary, including re-opening an investigation, if (1) evidence, including but not limited to, results from a sexual assault nurse examination (SANE), becomes available that was previously outside of the university's ability to access; (2) the Process and Procedures as set forth herein were not followed; or (3) additional circumstances warrant it.

(*Id.* at 4.)  Plaintiff argues that because the Director—who has discretion to grant this additional review—is the same person who approves the investigative report and issues the sanction, he was deprived of "sufficient or proper appeal rights."  (ECF No. 83 at 32–33.)  He also argues that he was not informed of his right to appeal to the Director. (*Id.* at 33.)

The University moves for summary judgment, arguing that Plaintiff did not avail himself of the Director's review process. (ECF No. 68 at 19; ECF No. 68-3 at 12:14–16 ("Q: Did you look into the possibility of an appeal within CU?  A: No.").)  According to the University, "[w]here the appeal procedures available mirror those Plaintiff wants – and Plaintiff didn't use the process available – *Mathews* does not require any additional appeal."  (ECF No. 68 at 19.)  The Court agrees.

Moreover, Plaintiff has not provided any case law supporting his argument that the deprivation of an appeal is an independent constitutional violation of procedural due

process rights, and the Court is not aware of any such law.  *See, e.g.*, *Flaim*, 418 F.3d at 637 (recognizing that "due process generally does not require an appeal from a school's decision that was reached through constitutional procedures"); *Winnick*, 460 F.2d at 549 n.5 (finding a suspended student "had no constitutional right to review or appeal after the disciplinary hearing which satisfied the essential requirements of due process").  Because Plaintiff has failed to provide any support for his argument that a lack of appeal is a procedural due process violation, the Court will grant summary judgment as to this theory of procedural due process in favor of the University.

       8.   <u>Instruction to Jane Doe</u>

Plaintiff alleges that the University also deprived him of due process by instructing Jane Doe not to cooperate with Plaintiff's private investigator, which interfered with his ability to collect evidence and defend himself.  (¶¶ 112, 165(x), 248(ix).)

The evidentiary record contradicts Plaintiff's assertion.  Instead, the notes from Polini's conversation indicate that she told Jane Doe that "she was not required by the OIEC to speak with any [private investigators] and that it could potentially violate the [no contact order] if the [private investigator] made harassing attempts to speak with her."  (ECF No. 83-4 at 17–18.)  This a factual statement.  As the Court has already recognized, "providing accurate information to Jane Doe about her obligations to speak with Plaintiff's private investigator (given that she has no such obligations), and pursuing administrative action against Plaintiff while criminal charges were pending, does not interfere with Plaintiff's rights to develop a criminal defense . . . ."  (ECF No. 59 at 27.)

Because Plaintiff has not identified a basis from which a reasonable factfinder could conclude that this factual statement violated Plaintiff's procedural due process, the Court grants summary judgment as to this theory of procedural due process in favor of the University.

9.     Meeting with Simons

Plaintiff claims that the University "forc[ed] [him] to meet with Simons in order to present 'mitigating factors' even though he did not admit responsibility."  (¶¶ 165(xi), 248(x).)

The University argues that there are no genuine issues of material fact relating to Plaintiff's meeting with Simons.  In support of its argument, it points to Plaintiff's own description of his meeting with Simons during his deposition:

> Q:     Did she say — did Ms. Simons say anything that was intimidating to you?
> A:     Besides asking me to admit something I didn't do, no.
> Q:     When she asked you to admit something you didn't do, what happened?
> A:     I just said, "No, I didn't do it," and that was it.
> . . .
> Q:     When you said you didn't do it, did she push?
> A.     No.

(ECF No. 68-3 at 11:8–21.)

The Court has already recognized that when determining a sanction, Simons may consider the respondent's acceptance of responsibility under the OIEC procedures.  (ECF No. 59 at 16.)  It has likewise found that "the University's investigation process—including seeking statements from Plaintiff about mitigating factors with respect to a potential sanction during the pendency of a criminal investigation—does not implicate Plaintiff's procedural due process rights."  (ECF No.

22

59 at 16.)  Accordingly, there is no genuine issue of material fact supporting this theory of due process violation.  The Court will grant summary judgment as to this theory of procedural due process in favor of the University.

      10.    <u>Trauma-Informed Investigative Approach</u>

Plaintiff alleges that the Hasselbacher and Polini "adopt[ed] a trauma-informed investigative approach which caused them to presume that Jane Doe's account to CUPD was truthful and precluded them from questioning Jane Doe's credibility or conducting independent analysis."  (¶¶ 165(iii), 248(ii).)

The Tenth Circuit has held that "[a] fundamental principle of procedural due process is a hearing before an impartial tribunal."  *Tonkovich*, 159 F.3d at 518. "A tribunal is not impartial if it is biased with respect to the factual issues to be decided at the hearing."  *Id.*  However, in order to establish a procedural due process claim predicated on bias, "there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated."  *Id.*; *Doe v. Cummins*, 662 F. App'x 437, 450 (6th Cir. 2016) (recognizing that "[a]ny alleged prejudice on the part of the [decisionmaker] must be evident from the record and cannot be based in speculation or inference" (alterations in original)); *de Llano v. Berglund*, 282 F.3d 1031, 1035–36 (8th Cir. 2002) (affirming summary judgment where plaintiff failed to provide any evidence supporting his assertion that the decision-makers had already made up their minds regardless of the evidence presented).

Plaintiff has not supported his claims of bias with sufficient evidence to survive summary judgment.  He alleges that bias may be inferred by the fact that OIEC

investigators were trained to use a "trauma-informed approach," which impacted the investigators' credibility determinations.  (ECF No. 83 at 33.)  This mere training, however, is insufficient to show that the OIEC investigators acted with bias *in Plaintiff's case*.  *See Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 601–02 (S.D. Ohio 2016) (finding that use of "training materials that allegedly presume that sexual assault complainants are truthful" were insufficient to show bias); *Gomes v. Univ. of Me. Sys.*, 365 F. Supp. 2d 6, 31–32 (D. Me. 2005) (finding the fact that the hearing board chair participated in sexual assault victim advocacy programs did not demonstrate that she was biased against the plaintiff in his sexual misconduct disciplinary hearing).  Although Plaintiff clearly disagrees with the investigators' ultimate credibility determinations, his mere suspicion of bias does not rise above the level of speculation, and is alone insufficient to raise a genuine dispute of material fact on this claim.

Accordingly, the Court will grant summary judgment as to this theory of procedural due process in favor of the University.

11.    Disclosure of Standing Review Committee Members

Plaintiff alleges that the University deprived him of procedural due process by "failing to disclose the names of the Standing Review Committee members or provide a right to challenge that process."  (¶¶ 165(xiii), 248(xii).)  In particular, he claims that Carole Capsalis should has been stricken from the Standing Review Committee because she "is Chancellor DiStefano's Assistant and, accordingly, she has a conflict of interest that should preclude her participation in the Standing Review Committee." (¶ 121.)  According to Plaintiff, because the University relies on federal awards which would be at risk if it was not complying with Title IX mandates, the "OIEC had a biased

attitude towards males" and Capsalis "was obviously forced to follow this 'policy.'" (ECF No. 83 at 34.)

The Court has already dismissed Plaintiff's Title IX claim with prejudice because Plaintiff failed to raise a plausible inference of gender bias.  (ECF No. 59 at 33–34.) The mere fact that Capsalis may have been responsible for Title IX compliance is likewise insufficient to support a claim that she "is actually biased with respect to factual issues being adjudicated."  *Tonkovich*, 159 F.3d at 518; *Univ. of Cincinnati*, 173 F. Supp. 3d at 602 (recognizing that "it is not reasonable to infer that [the university] has a practice of railroading students accused of sexual misconduct simply to appease the Department of Education and preserve its federal funding").

Moreover, Capsalis submitted a sworn declaration attesting that she has "never felt any sort of pressure from Chancellor DiStefano concerning my work on the Standing Review Committee" and has "never felt any pressure from him to approve or not approve the investigation report in this or any other case."  (ECF No. 68-6 at 1.) Plaintiff attempts to cast doubt on this declaration, arguing—without evidence—that this declaration is "without any value" because "[h]er job would have been at risk writing the opposite."  (ECF No. 83 at 34.)  Such an allegation is insufficient to create a genuine factual dispute sufficient to survive summary judgment.

The Court will therefore grant summary judgment as to this theory of procedural due process in favor of the University.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS that:

1.     Defendant's Motion for Summary Judgment (ECF No. 68) is GRANTED IN PART and DENIED IN PART as follows:

    a.     As set forth herein, Defendant's Motion for Summary Judgment is GRANTED as to procedural due process violations arising from:

        i.     The University's failure to conduct independent interviews of Jane Doe;

        ii.     The use of a preponderance of the evidence standard;

        iii.     The Standing Review Committee process;

        iv.     Plaintiff's right to appeal;

        v.     The University's instruction to Jane Doe that she was not required to speak with Plaintiff's private investigator;

        vi.     Plaintiff's meeting with Simons;

        vii.     The University investigators' "trauma-informed" investigative approach; and

        viii.     Disclosure of the Standing Review Committee Members.

    b.     Defendant's Motion for Summary Judgment is DENIED in all other respects; and

2.     This matter REMAINS SET for a Final Trial Preparation Conference on **November 13, 2020, at 10:00 AM**, and a 3-day bench trial commencing on **December 1, 2020, at 8:30 AM**, both in Courtroom A801.

Dated this 20th day of August, 2020.

BY THE COURT:

William J. Martinez
United States District Judge